COMMONWEALTH of Pennsylvania, DEPARTMENT OF PUBLIC WELFARE, Petitioner

v.

James EISEMAN, Jr. and the Public Interest Law Center of Philadelphia, Respondents.

Aetna Better Health, Inc., Health Partners of Philadelphia, Inc., and Keystone Mercy Health Plan, Petitioners

v.

James Eiseman, Jr., and the Public Interest Law Center of Philadelphia, Respondents.

UnitedHealthcare of Pennsylvania, Inc. D/B/A UnitedHealthcare Community Plan and HealthAmerica Pennsylvania Inc. D/B/A CoventryCares, Petitioners

v.

James Eiseman, Jr. and the Public Interest Law Center of Philadelphia, Respondents.

Commonwealth Court of Pennsylvania.

Argued Oct. 9, 2013.
Decided Feb. 19, 2014.

**1120** 

Christopher H. Casey and Erin C. Galbally, Philadelphia, for petitioners Health Partners of Philadelphia, Inc., Keystone Mercy Health Plan and Aetna Better Health Inc.

Leonard W. Crumb, Senior Assistant Counsel, Harrisburg, for petitioner Department of Public Welfare.

Karl S. Myers, Philadelphia, for petitioners HealthAmerica Pennsylvania, Inc., UnitedHealthcare of Pennsylvania, Inc., UnitedHealthcare Community Plan and ConventryCares.

James Eiseman, Jr. and Benjamin D. Geffen, Philadelphia, for respondents James Eiseman, Jr. and The Public Interest Law Center of Philadelphia.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge and COVEY, Judge.

OPINION BY Judge SIMPSON.

This fact-intensive Right–to–Know Law (RTKL)[1] petition for review from a final determination of the Office of Open Records (OOR) implicates rate-setting in the managed care industry.[2] OOR ordered disclosure of rates set by contracts related to the Department of Public Welfare's (DPW) administration of the Medicaid program. DPW asserted the rates were exempt under the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. §§ 5301–5308, (Trade Secrets Act), agency regulations and exceptions under the RTKL, including Section 708(b)(11) of the RTKL, 65 P.S. § 67.708(b)(11), which protects confidential proprietary information and trade secrets. Five Managed Care Organizations (MCOs) submitted evidence as direct interest participants below. After a hearing, OOR reasoned these exemptions did not apply. Upon our independent review of the evidentiary record created below, this Court affirms in part and reverses in part.

### I. Background

DPW administers the Medicaid program, which provides medical and dental care to low-income children, certain adults and some disabled persons in Pennsylvania. In part, the Medicaid program is funded through federal funds and adminis-

---

1. Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101–67.3104.

2. These consolidated cases were argued separately with *Dental Benefit Providers, Inc. v.*

*Eiseman,* 86 A.3d 932 (Pa.Cmwlth.2014) (consolidated) (*Eiseman II* ), as both appeals involve similar legal issues and share many parties in interest, including DPW.

tered in accordance with federal law, 42 U.S.C. §§ 1396–1396w–5. In Southeast Pennsylvania, DPW operates Medicaid through the HealthChoices Program, contracting with five MCOs to provide services to eligible program recipients. The MCOs provide dental care almost exclusively by subcontracting with dental subcontractors (Subcontractors). Four of the five MCOs use the same Subcontractor, DentaQuest.[3]

DPW does not negotiate rates for dental services, or set parameters for such rates in its contracts. DPW contracts with the MCOs requiring them to ensure access to dental care to eligible recipients.

Pursuant to the RTKL, James Eiseman, Jr. of The Public Interest Law Center of Philadelphia (Requester) requested the following records from DPW:

> Each and every document, including correspondence, and appendices, that sets forth any *rate of payment*, including but not limited to capitation rates, that DPW pays to any Medicaid HMO [4] to provide Medicaid coverage to recipients in Southeastern Pennsylvania, including but not limited to any document that isolates *the amount per member per month* DPW calculates it pays to provide dental services to Medicaid recipients under 21 years of age. [OOR referred to as Item 1.]

Each and every document including correspondence and appendices, in DPW's possessions, [sic] custody, or control that sets forth the amount for any one or more individual dental procedure codes that any Medicaid HMO pays to provide dental services to Medicaid recipients in Southeastern Pennsylvania. [OOR referred to as Item 2.]

> or (b) otherwise establishes the rate of payment by which any Medicaid HMO and/or Medicaid Dental Subcontractor compensates or has compensated dentists (and/or other providers of dental services) for the provision of dental services to Medicaid recipients in Southeastern Pennsylvania.

(emphasis added). The request is limited to the period from July 1, 2008, through June 15, 2011, and focuses on the provision of dental services.

Essentially, Item 1 of the request sought rates paid by DPW to the MCOs, per member, per month, based on annually negotiated capitation rates (Capitation Rates).[5] Item 2 sought the rates the MCOs pay in turn primarily [6] to Subcontractors for dental services (MCO Rates).[7]

Depicted in simplified diagram form, the relationships are generally as follows:

**DPW→ MCOs→ Subcontractors→ Providers.**

---

3. One of the petitioners, United Healthcare of Pennsylvania, Inc., uses Dental Benefits Providers, Inc. (DBP), a party in *Eiseman II*. DentaQuest is also a party in *Eiseman II*.

4. Health maintenance organizations, HMOs, refer to managed care organizations here.

5. During oral argument, counsel for Petitioners confirmed the Capitation Rates paid by DPW, per member, per month, also referred to as the PMPM rate, include all health services. The Capitation Rates do not isolate payments pertaining to dental services, which are at issue in this appeal.

6. In limited programs involving special needs patients, certain MCOs pay providers directly, (*e.g.*, Health Partners' Special Smiles program). Reproduced Record (R.R.) at 327a.

7. The MCO Rates are comprised of the rates paid to Subcontractors and rates paid directly by MCOs to providers. As Requester does not distinguish between these parties in his analysis, we collectively refer to these rates by reference to the MCOs as payers. Provider Rates paid by Subcontractors are addressed in *Eiseman II*.

DPW denied the request, stating it notified the entities implicated as subjects of the Request, namely: United Healthcare of Pennsylvania, Inc. (United); Aetna Better Health, Inc. (Aetna); Health America of Pennsylvania, Inc. d/b/a CoventryCares (Coventry); Keystone Mercy Health Plan, Inc. (Keystone); and, Health Partners of Philadelphia, Inc. (Health Partners) (collectively, the MCOs). The MCOs advised DPW the records are exempt on the following grounds: the Trade Secrets Act; Section 708(b)(11) of the RTKL (confidential proprietary information and trade secrets exception); and, other state and/or federal regulations and/or statutes. Requester appealed to OOR.

The MCOs asked to participate in the proceedings. OOR permitted the MCOs to participate and, at the MCOs' request, authorized a hearing.

OOR designated a hearing officer to hold one of its first hearings under the RTKL.[8] During the hearing, the MCOs submitted testimony of one fact witness each: John Sehi, then Vice President of Finance at Health Partners; Deborah Nichols, CEO at Aetna; William Morsell, Senior Vice President at Keystone; Heather Cianfrocco, President at United; and, Nancy Sirolli–Hardy, Vice–President of Operations at Coventry. The MCOs' fact witnesses emphasized the confidentiality of the MCO Rates, both in their maintenance, and in confidentiality provisions of their upstream agreements with DPW and of their downstream agreements with Subcontractors.

In addition, Henry Miller, Ph.D., an expert in the field of health care consulting, testified. Dr. Miller testified about the formulation of MCO Rates (MCO→ Subcontractors) and the significance of competitors knowing these rates. He opined that in his more than 40 years in the industry, he has not seen instances where rate information was disclosed outside the MCOs. He also provided his expert opinion that rates MCOs pay are trade secrets and confidential proprietary information to the MCOs. He testified that disclosure of MCO Rates would reduce the value of the MCOs' considerable investment in negotiating favorable rates. Notably, Dr. Miller did not testify about the Capitation Rates (DPW→ MCOs).

Requester did not submit testimonial evidence or affidavits.

Based on the record created by the hearing officer, an appeals officer for OOR issued a final determination granting the appeal. *Eiseman/The Public Interest Law Center v. Dep't of Pub. Welfare,* OOR Dkt. No. AP 2011–1098 (Pa. OOR, filed Sept. 17, 2012). OOR reasoned none of the cited exemptions applied, and it ordered disclosure. OOR concluded the rates constituted financial records that must be disclosed, with minimal exceptions for redaction. Although the parties raised both the Trade Secrets Act and the RTKL exception protecting trade secrets, OOR only applied the trade secrets exception in Section 708(b)(11). In deciding the records were not trade secrets, OOR relied on this Court's holding in *Lukes v. Department of Public Welfare,* 976 A.2d 609 (Pa.Cmwlth. 2009), which was decided under the prior Right–to–Know Law (Prior Law).[9]

The direct interest participants and DPW appealed to this Court[10] in separate

---

8. The designated hearing officer made evidentiary rulings, but did not submit recommended findings or any recommended decision based on the record.

9. Formerly Act of June 21, 1957, P.L. 390, *as amended,* 65 P.S. §§ 66.1–66.9 (repealed by RTKL).

10. In a RTKL appeal involving a Commonwealth agency, this Court may independently

actions.[11] This Court consolidated these appeals because they challenge the same final determination, and raise common legal issues.

## II. Discussion

In their joint brief, United and Coventry (collectively, United) argue OOR erred when it relied on *Lukes* to hold the rates are financial records. United asserts both the Capitation Rates (DPW→ MCOs) and the MCO Rates (MCO→ Subcontractors) are exempt under the Trade Secrets Act. They also argue the Trade Secrets Act should be applied separately from the exception in Section 708(b)(11) of the RTKL. United contends the MCO Rates are also protected as confidential proprietary information under Section 708(b)(11) of the RTKL.

In their brief, Aetna, Health Partners and Keystone (collectively, Aetna) argue OOR erred in relying on *Lukes* in ordering disclosure of the MCO Rates. Aetna asserts the MCOs' evidence established the confidential proprietary exception in Section 708(b)(11). These MCOs also argue the MCO Rates are exempt as trade secrets under the Trade Secrets Act.

DPW agrees that *Lukes* does not control because it was not decided under the current RTKL. Further, it argues OOR erred in failing to analyze the trade secrets exception in the RTKL separately from the Trade Secrets Act. DPW also asserts OOR ignored the potential economic value of the Capitation Rates, supported by the sizeable record. DPW did not address the MCO Rates in its brief.

Requester counters that this Court's decision in *Lukes* compels disclosure. Requester also asserts the documents consti-

tute "financial records" as defined in the RTKL; therefore, exceptions applicable under the RTKL are very limited. Requester further contends that petitioners did not meet their burden of proving applicable exemptions. Requester submits that neither the Trade Secrets Act, nor Section 708(b)(11) of the RTKL protects the rates at issue.

■■■■ The current RTKL contains a presumption of openness as to any records in an agency's possession. *Bowling v. Office of Open Records,* —— Pa. ——, 75 A.3d 453 (2013). Records in possession of a Commonwealth agency are presumed to be public unless they are: (1) exempted by Section 708 of the RTKL; (2) protected by a privilege; or, (3) exempted "under any other Federal or State law or regulation or judicial order or decree." Section 305 of the RTKL, 65 P.S. § 67.305. For a question of law under the RTKL, our scope of review is plenary. *Dep't of Corr. v. Office of Open Records,* 18 A.3d 429 (Pa.Cmwlth. 2011).

■■ DPW is a Commonwealth agency as defined by the RTKL. Section 102 of the RTKL, 65 P.S. § 67.102. A Commonwealth agency bears the burden of proving a record is exempt from disclosure. *Dep't of Transp. v. Office of Open Records (Aris),* 7 A.3d 329 (Pa.Cmwlth.2010). When a party with a direct interest participates before OOR, that party bears the burden of proving its asserted exemptions. *Allegheny Cnty. Dep't of Admin. Servs, v. Parsons (ASCI II),* 61 A.3d 336 (Pa. Cmwlth.2013) *(en banc* ).

There is no dispute the Capitation Rates (DPW→ MCOs) are in DPW's possession.

review OOR's order and substitute its own findings of facts for those of an appeals officer. *Bowling v. Office of Open Records,* —— Pa. ——, 75 A.3d 453 (2013).

11. United and Coventry filed an appeal (Dkt. No. 1950 C.D. 2012) and Aetna, Health Partners, and Keystone filed an appeal (Dkt. No. 1949 C.D. 2012), here consolidated.

As there is no apparent dispute that DPW also has access to the MCO Rates (MCO→ Subcontractors), we accept for current purposes that DPW possesses the records at issue in this case.

### A. Capitation Rates (DPW→ MCOs)

In Item 1, Requester seeks Capitation Rates, which are the amounts paid per member, per month or "PMPM" in the Medicaid Program. A number of pertinent facts regarding the information are undisputed. There is no dispute that the Capitation Rates are paid by DPW directly to the MCOs. The agreements between DPW and the MCOs set forth the Capitation Rates, and the payments represent taxpayer funds disbursed for services performed on behalf of a Commonwealth agency. Also, there is no dispute regarding "agency possession." Further, there is no dispute that MCOs are contracted to perform a government function, "implementing the Commonwealth's Medicaid program." *See* Pet'r Aetna's Reply Br. at 4.

OOR concluded the Capitation Rates are "financial records." After analyzing the relevant statutory provisions, we agree.

### 1. Financial Record Status

■ The RTKL defines "records" in pertinent part as follows:

Information, regardless of physical form or characteristics, that *documents a transaction or activity of an agency and* that is created, *received* or retained pursuant to law or *in connection with* a transaction, business or *activity of the agency.*

Section 102 of the RTKL, 65 P.S. § 67.102 (emphasis added).

The Capitation Rates are records within DPW's possession that evidence its transaction of paying MCOs pursuant to the Medicaid HealthChoices Program. Signif-

icant to our discussion, the records also qualify as "financial records." Redaction of "financial records" is precluded except under limited RTKL exceptions not raised here. In pertinent part, "financial records" are defined in Section 102 of the RTKL as "any account, voucher, or contract dealing with: (i) the receipt or disbursement of funds by an agency; or (ii) an agency's acquisition, use or disposal of services, supplies, materials, equipment or property." 65 P.S. § 67.102.

Section 708(c) of the RTKL, 65 P.S. § 67.708(c), provides that the exceptions in subsection 708(b) shall not apply to financial records, except certain information may be redacted under specifically enumerated exceptions. Section 708(b)(11) of the RTKL, which protects trade secrets and confidential proprietary information, is not among the RTKL exceptions for which redaction is allowed. As a consequence, such information cannot be redacted from financial records based on the trade secrets and confidential proprietary exception in the RTKL.

■ After concluding the Capitation Rates are financial records, OOR completed its inquiry, reasoning that trade secrets are not exempt because the Legislature did not include Section (b)(11) (trade secret/confidential proprietary information) among the RTKL exceptions for which redaction is allowed. Further, OOR relied on *Lukes,* which rejected the Trade Secrets Act as an independent defense to disclosure.

Section 708(c) precludes the operation of most RTKL exceptions to "financial records;" however, as explained below, Section 708(c) cannot dilute operation of another law that provides an independent statutory bar to disclosure. We reach this conclusion in part because the RTKL expressly recognizes the superior position of

other laws, statutory or regulatory, federal or state, in barring disclosure under the RTKL.

Notably, Section 306 of the RTKL (relating to nature of document), provides: "Nothing in this act shall supersede or modify the public or nonpublic nature of a record or document established in Federal or State law, regulation or judicial order or decree." 65 P.S. § 67.306. Further, Section 3101.1 of the RTKL provides "if the provisions of [the RTKL] regarding access to records conflict with any other federal or state law, *the provisions of this act shall not apply.*" 65 P.S. § 67.3101.1 (emphasis added). The Trade Secrets Act is a state law that takes precedence over other provisions in the RTKL.

Given these express provisions of the current RTKL, OOR erred in addressing trade secrets as a RTKL exception only, while discounting the stand-alone statutory basis for protection in the Trade Secrets Act.

In the course of analyzing whether the Capitation Rates are trade secrets, OOR consulted this Court's decision in *Lukes*. *Lukes* specifically addressed the Trade Secrets Act as an exemption to disclosure under the Prior Law. *Lukes* involved provider agreements between HMOs and provider hospitals. While most of the opinion in *Lukes* addressed statutory construction of the Prior Law, the opinion also briefly reviewed whether rates in the provider agreements are protected from disclosure as trade secrets.

The *Lukes* Court reasoned that, "a party that voluntarily participates in a public program and is receiving and disbursing public funds in furtherance of that program has no legitimate basis to assert that these activities are private and should be shielded from public scrutiny." *Lukes*, 976 A.2d at 627. In so doing, the Court emphasized the policy implications of the expenditure of public funds under contracts entered for the ultimate benefit of Medicaid recipients. OOR followed *Lukes*.

However, in light of the substantial differences between the current RTKL and the Prior Law, OOR erred in relying on *Lukes* here. This substantial difference is most obvious in the severe restriction on redaction of "financial records." [12] We thus conclude OOR erred in relying on *Lukes*, and it was required to apply the Trade Secrets Act as a separate statutory defense.[13]

### 2. Exempt by Other Law: [14] The Trade Secrets Act

■ To the extent the Capitation Rates constitute trade secrets, that information

---

**12.** Using similar reasoning, this Court repeatedly declines to follow *Lukes* in resolving cases under the new RTKL. *Honaman v. Lower Merion Twp.*, 13 A.3d 1014 (Pa.Cmwlth. 2011) (distinguishing *Lukes* and holding records of tax collector are not records of agency, and are not reached under current RTKL because there is no contract between the tax collector and the agency); *In re Silberstein*, 11 A.3d 629 (Pa.Cmwlth.2011) (stating that because *Lukes* was decided under the former version of the RTKL, it was not controlling); *Office of the Budget v. Office of Open Records*, 11 A.3d 618 (Pa.Cmwlth.2011) (stating *Lukes* was inapposite to current case because it was decided under the Prior Law).

**13.** The MCOs contend OOR raised the "financial records" basis for disclosure on its own motion, and it is, therefore, an improper basis for the final determination. We disagree. *Lukes* was central to OOR's analysis and thoroughly briefed by the parties, and it implicates the financial records definition since it was decided under the Prior Law. Moreover, the parties briefed the financial record issue to this Court, so any alleged prejudice is cured.

**14.** Petitioners cite the Department of Health's (DOH) HMO regulation, 28 Pa.Code § 9.602 regarding reporting requirements, as a regulatory exemption. The regulation pertains to

may be redacted in accordance with the Trade Secrets Act. The Trade Secrets Act protects against misappropriation of trade secrets, which includes disclosure without consent. 12 Pa.C.S. § 5302. This Court recognized the Trade Secrets Act as a statutory exemption from disclosure in *Parsons v. Pennsylvania Higher Education Assistance Agency (PHEAA)*, 910 A.2d 177 (Pa.Cmwlth.2006).

Trade secrets are defined as, "[i]nformation including a formula, drawing, pattern, compilation, including a customer list, program, device, method, technique or process that:

(1) derives economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; [and]

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

12 Pa.C.S. § 5302.

■ Pennsylvania courts confer "trade secret" status based upon the following factors: (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by employees and others in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to his business and to competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See, e.g., Crum v. Bridgestone/Firestone N. Amer. Tire*, 907 A.2d 578 (Pa.Super.2006) (adopting standard from RESTATEMENT (SECOND) OF TORTS § 757 (1965)). To constitute a "trade secret" under the Trade Secrets Act, it must be an "actual secret of peculiar importance to the business and constitute competitive value to the owner." *PHEAA*, 910 A.2d at 185. The most critical criteria are "substantial secrecy and competitive value." *Crum*.

■ Whether information qualifies as a "trade secret" is a highly fact-specific inquiry that cannot be distilled to a pure matter of law. Under other circumstances, we might remand to OOR to reconsider the evidence based on our guidance here. However, this case has already seen significant delays, and OOR commendably created a complete record after a full hearing where interested third parties participated. Therefore, this Court takes advantage of the extensive factual record developed below in determining whether the Capitation Rates are exempt as trade secrets by separate statute.

The record reveals little evidence of competitive value in the Capitation Rates. Dr. Miller, the health care consultant, confined his testimony to the MCO Rates. The MCOs' fact witnesses did not identify any competitive harm from Capitation Rate disclosure, except as to DPW. For its part, DPW submitted evidence indicating that its negotiating position may be undermined by each MCO knowing the Capitation Rate agreed to by other MCOs. However, a potentially weaker negotiating position does not establish trade secret status.

Other than confidentiality provisions in its contracts, DPW makes no special effort to maintain the secrecy of Capitation Rates. DPW did not submit evidence ex-

reimbursement information submitted to DOH, not DPW. As DPW sets Capitation Rates, and there is no indication in the record that the Rates are submitted to DOH as "reimbursement information," the regulation has no obvious application.

plaining how disclosure harms the potential economic value in the Capitation Rates. Relevant to this inquiry is that DPW does not have competitors in this market; DPW is the Commonwealth agency charged with administering the Medicaid program in Pennsylvania, and is in no danger of losing market share to competitors.

Because no party proved the Capitation Rates constitute trade secrets, and no statute establishes their protected nature, DPW is required to disclose them. We thus affirm OOR as to the Capitation Rates, albeit on different grounds.

### B. MCO Rates (MCO→Subcontractors)

■ MCO Rates, by contrast, are not "financial records" because they are not contained in contracts of a Commonwealth agency and do not involve disbursement of funds by a Commonwealth agency.

The current RTKL refers to the source of funds in the definition of "financial records." While MCOs may very well be disbursing funds from DPW, the statute does not use the phrase "disbursement of agency funds;" rather, the definition refers to disbursement of funds "*by* an agency." 65 P.S. § 67.102 (emphasis added). DPW disburses funds in its contracts with the MCOs. In contrast, MCO Rates involve disbursement by a contractor of an agency. This is a significant distinction OOR ignored. Because MCO Rates are not disbursed "by an agency," OOR erred in concluding MCO Rates are "financial records."

That MCOs disbursed funds they received from DPW to their subcontractors does not render the MCOs mere conduits for public funds. Based on the language of the current RTKL, the funds lose their character as public funds once they leave an agency's hands and enter the private sector. This is contrary to our statement in *Lukes* under the Prior Law. 976 A.2d at 625. To the extent that reasoning was central to the holding, *Lukes* it is no longer valid in cases under the current RTKL.

Because we conclude the MCO Rates are not "financial records," we next consider the RTKL exceptions that OOR did not fully analyze based on its adherence to *Lukes*. Typically, we would remand to OOR to serve as fact-finder. However, the unique circumstances here, including the complexity of the case, the number of parties involved, the robust record creation by hearing, and the amount of time already transpired, encourages us to retain jurisdiction and decide the merits. As we have sufficient information to analyze the issues, and we wish to resolve these complicated matters with as much expedition as is consistent with fairness, we exercise our independent judgment based on the current record. *Bowling.* The following discussion constitutes our narrative findings and conclusions

Although Section 708(b)(11) protects both trade secrets and confidential proprietary information from disclosure in the same exception, the RTKL defines these terms differently. Thus, the terms must be analyzed separately. *See Office of the Governor v. Bari*, 20 A.3d 634 (Pa.Cmwlth. 2011).

#### 1. Confidential Proprietary Information

■ The MCOs assert the MCO Rates constitute "confidential proprietary information," which the RTKL defines as:

Commercial or financial information received by an agency: (1) which is privileged or confidential; *and* (2) the disclosure of which would cause substantial harm to the competitive position of the person that submitted the information.

65 P.S. § 67.102 (emphasis added). To qualify as "confidential proprietary information," the information must meet both components of the two-part test.

### a. Confidential Information

In considering whether the MCO Rates are "confidential," we consider the efforts the parties undertook to maintain their secrecy.

The individual MCOs compete with each other for members, and they make efforts to maintain the secrecy of MCO Rates. Specifically, the MCOs provide contractual protections with confidentiality provisions in the contracts with their Subcontractors [15] and providers. The MCOs guard copies of the contracts containing MCO Rates, (e.g., Health Partners keeps a single copy in its legal department; Aetna keeps copies under lock and key and limits electronic copies). MCOs also provide confidentiality training to employees to protect the records. As this record reflects the MCOs treat the MCO Rates as confidential information, the MCOs meet the first part of the test.

### b. Substantial Harm to Competitive Position

#### i. Standard

 In evaluating the "substantial harm" to "competitive position," we acknowledge that the terms have acquired special legal significance. In particular, we consider federal case law interpreting the Freedom of Information Act, 5 U.S.C. § 552, (FOIA) and its exemption for "commercial or financial information obtained from a person." Notably, "substantial harm to competitive position" is the identical language used in FOIA. Under federal

case law, a submitter of confidential records does not need to demonstrate *actual* competitive harm. *See Cozen O'Connor v. U.S. Dep't of Treasury*, 570 F.Supp.2d 749 (E.D.Pa.2008) (citing *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280 (D.C.Cir.1983)). Potential harm may trigger protection.

In determining whether disclosure of confidential information will cause "substantial harm to the competitive position" of the person from whom the information was obtained, an entity needs to show: (1) actual competition in the relevant market; and, (2) a likelihood of substantial competitive injury if the information were released. *Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1194 (9th Cir.2011); *GC Micro Corp. v. Def. Logistics Agency*, 33 F.3d 1109, 1112 (9th Cir.1994) (adopting the standard from *Nat' Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C.Cir.1974)).

 "Competitive harm analysis 'is limited to harm flowing from the affirmative use of proprietary information by competitors. Competitive harm should not be taken to mean simply any injury to competitive position.'" *Watkins*, 643 F.3d at 1195 (citation omitted). The word "substantial" appears in the statute to characterize the degree of injury needed to apply this exception.

We applied the confidential proprietary information exception in *Giurintano v. Department of General Services (DGS)*, 20 A.3d 613 (Pa.Cmwlth.2011). In *Giurintano*, the requester sought independent contractor agreements between a private company and interpreters for telephone translation services. The private company

---

**15.** We reject Requester's contention that Subcontractor DentaQuest's knowledge of four of the five MCO Rates undercuts their confidential nature. DentaQuest is not a competitor of the MCOs; rather, it is a Subcontractor. Also, it is bound to maintain secrecy of the rates of MCOs with which it contracts.

subcontracted with interpreters to provide translation services under contract with a Commonwealth agency, DGS. The private company submitted evidence that the identity of its interpreters was highly valuable proprietary information. This Court concluded that interpreter identities in subcontracts were properly redacted because the company established the list of interpreters constituted a business asset, and was confidential.

To support the confidential proprietary information exception in *Giurintano*, the company submitted evidence. In its affidavit, the company described the investment involved in developing a list of quality interpreters. The company explained that the identities are closely guarded. Moreover, identities were protected by using unique identifiers for each interpreter rather than names, even internally, and limiting access of the list to few employees. The company emphasized the importance of a quality list to the success of a business in the interpretation industry, such that it invested substantial resources in obtaining a list of highly skilled interpreters of over 240 languages. Notably, the founder and CEO of the company attested:

> Divulging the names of [company's] interpreters will cause great business and economic harm to [company] by allowing competitors to gain the fruits of [its] labors in identifying a vast network of interpreters offering a quality of interpretation and languages unmatched in the industry.

*Giurintano*, 20 A.3d at 616–17 (quoting CEO affidavit). Thus, in *Giurintano*, the company described the harm and described its degree.

### ii. Fact Witnesses

Compared to the affidavit in *Giurintano*, the testimony of the fact witnesses here falls short. None of the fact witnesses definitively characterize the harm that is likely to result from disclosure of the MCO Rates as "substantial." Further, in response to questions about whether competitive harm may result from disclosure, the majority of fact witnesses state that they "think" or "believe so." *See* Reproduced Record (R.R.) at 521a (Keystone); 435a (Aetna).

In addition, case law does not fill this gap. The MCOs do not cite cases holding that rates paid to subcontractors in the managed care industry are proprietary information, the disclosure of which would cause substantial competitive harm. *See, e.g., Wilmington Star–News v. N. Hanover Reg'l Med. Ctr., Inc.*, 125 N.C.App. 174, 480 S.E.2d 53 (1997) (state statute specifically exempted health care confidential competitive information, *i.e.*, negotiated price lists, from the public records law, but protection only applied to private persons not corporations).

Here, the MCOs had to identify the competitive harm and submit evidence regarding how disclosure would cause "substantial harm" to their respective competitive positions. Facts regarding the alleged significant harm, and the relationship between the information redacted and the alleged harm, must be substantiated to support nondisclosure under Section 708(b)(11). *Giurintano*.

In this case, the actual competition in the relevant market among the five MCOs is apparent. The evidence shows the market for Medicaid managed dental care is small in Southeast Pennsylvania. As the MCOs compete for market share, gain for one means loss for another. R.R. 413a, 499a, 509a. In addition, a corporate representative from each MCO testified that disclosure of the MCO Rates would impair or harm that MCO's competitive position. However, the degree of harm is not appar-

ent from the testimony of the MCOs' fact witnesses.

 From our review of the record, the MCOs' fact witnesses did not explain how the harm quantifies as "substantial." The MCOs' fact witnesses testified as to their respective "beliefs" in the competitive harm that may result from disclosure. "Although the court need not conduct a sophisticated economic analysis of the likely effects of disclosure ... conclusory and generalized allegations of substantial competitive harm ... are unacceptable and cannot support an agency's decision to withhold requested documents." *Watkins,* 643 F.3d at 1195 (construing FOIA).

Nevertheless, the testimony of MCOs' fact witnesses provides some support for non-disclosure. Nichols of Aetna explained the harm as follows: "Negotiating contracts is a complex process that we set multiple variables. If those rates were available to competitors or to other providers, then the sole focus becomes about how to get the best rate or the highest rate, and it—you know, it would completely change the way that the market works." R.R. at 435a. In addition, the MCOs' witnesses each testified about the significant time and funds invested in developing the rates.

### iii. Expert Witness

Moreover, the expert testimony regarding industry practice, the highly sensitive nature of the information, and potential for substantial harm from its disclosure, tips the balance in favor of protecting MCO Rates as proprietary information. Dr. Miller's expert testimony weighs in favor of protection.

Over Requester's objection, the hearing officer accepted Dr. Miller, a health care consultant with 40 years' experience in the managed care industry, to offer expert testimony. Dr. Miller testified that MCO

Rates are valuable in the industry because of the investment required to maintain a competitive edge in gaining enrollees. The rates represent significant investments by each MCO, based on efficiencies, provider specialties and breadth of provider networks, quality of care, and, presumably small margins of profitability. Dr. Miller's expert testimony regarding industry practice to maintain confidentiality of MCO Rates is persuasive. He explained the highly competitive MCO Rates reflect pricing methodologies that are an essential part of the MCOs' business models.

 Requester challenges the protected nature of the rates because many of the rates at issue are years old, and thus stale. The age of proprietary information may weigh against its protected nature. *See Clark v. Prudential Ins. Co. of Amer.,* Civ. No. 08–6197, 2011 WL 1833355 (D.N.J., filed May 13, 2011) (unreported) (decided in context of protective order) (citing *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.,* 129 F.R.D. 483 (D.N.J.1990)). Thus, it is relevant that the MCOs submitted evidence regarding the annual fluctuation of rates based on a number of variables. The MCOs needed to show the disclosure of rate information from 2008, 2009 and 2010 contracts is likely to result in present harm.

Dr. Miller did not differentiate. Although the rates fluctuate, such that disclosure of one year's rate does not necessarily disclose all yearly rates, there is no evidence suggesting the rate information is "stale" when it is five years old. There is only the passage of time.

Ultimately, based on the expert testimony regarding the confidential proprietary nature of MCO Rates, we hold the evidence is sufficient to meet the preponderance of the evidence standard under Section 708(a) of the RTKL, 65 P.S.

§ 67.708(a). *Delaware Cnty. v. Schaefer/Phila. Inquirer,* 45 A.3d 1149 (Pa. Cmwlth.2012) (*en banc*) (by a preponderance is the lowest evidentiary standard, tantamount to a more likely than not inquiry). Therefore, the MCO Rates are protected as confidential proprietary information under the trade secrets and confidential proprietary information exception in Section 708(b)(11) of the RTKL.

### 2. Trade Secrets

The Trade Secrets Act defines "trade secrets" identically to the RTKL. *Compare* Section 102 of the RTKL, 65 P.S. § 67.102, *with* 12 Pa.C.S. § 5302 of the Trade Secrets Act. While we recognize these exemptions are asserted as two independent denial grounds, because the RTKL and the Trade Secrets Act employ the same definition, it is unnecessary for this Court to conduct a separate analysis of trade secret status under the RTKL exception. *Cf. Office of the Governor v. Scolforo,* 65 A.3d 1095 (Pa.Cmwlth.2013) (*en banc*) (incorporation of the privilege into the RTKL exception obviates the need to analyze the deliberative process privilege separately from the predecisional deliberative exception).

Having already held the MCO Rates are protected under the confidential proprietary information exception of the RTKL, it is not necessary to fully discuss their status as trade secrets. It is sufficient to observe that the fact witness and expert witness evidence discussed above establishes by a preponderance of the evidence the elements for trade secret status. *Crum; see PHEAA.*

### III. Conclusion

The Capitation Rates (DPW→ MCOs) are public records evidencing a disbursement of public funds by a Commonwealth agency, DPW. They are not exempt under the Trade Secrets Act because there is no indication of competitors for DPW, and no expert testimony was proffered regarding their trade secret status. The Capitation Rates, shared among government agencies managing health care, represent an investment of time, and a potential for undermining DPW's future negotiating position. However, that is a speculative harm, particularly as DPW is the only "game in town" as to the HealthChoices Program. In sum, we agree with the result OOR reached, although for different reasons.

As to the MCO Rates (MCO→ Subcontractors), we exercise our independent judgment based on the existing comprehensive record. *Bowling.* Much of the evidence from fact witnesses, while strong as to the efforts to maintain secrecy, is weak as to the "substantial harm to competitive position" component. The evidence varies among the MCOs as to how they maintain confidentiality and how they develop their rates. What is true in all cases is that the MCOs take reasonable efforts to maintain confidentiality of the MCO Rates, and they do not share them. Most persuasive was Dr. Miller's expert testimony regarding the industry standard for strict confidentiality and the competitive harm that could result from disclosure.

The importance of the MCO Rates to each MCO's business model, and continued financial vitality in the industry, weighs in favor of holding the information constitutes confidential proprietary information and trade secrets.

For the foregoing reasons, we affirm OOR's final determination requiring disclosure of the Capitation Rates (DPW→ MCOs), and we reverse OOR's determination as to the MCO Rates (MCO→ Subcontractors).

### ORDER

**AND NOW,** this 19th day of February, 2014, the Office of Open Records' final

determination is **AFFIRMED IN PART, and REVERSED IN PART** in accordance with the foregoing opinion.

## CONCURRING AND DISSENTING OPINION BY Judge McCULLOUGH.

In this Right–to–Know Law (RTKL)[1] case, James Eiseman, Jr. and the Public Interest Law Center of Philadelphia (Requesters) seek rates set by contracts entered into between the Pennsylvania Department of Public Welfare (DPW) and various private entities as they pertain to the administration of the dental care aspect of the Medicaid[2] program and the distribution of public funds to implement the program and pay dental care providers for their services.

DPW administers Medicaid, and through the HealthChoices Program, provides dental care to Medicaid recipients. No one disputes that the Medicaid funds for the HealthChoices Program derive from federal and state funds. Rather than contract directly with dental providers to establish a payment rate for their services, DPW delegates its duty to implement Medicaid dental coverage by executing a series of contracts with "middlemen" who eventually contract with dental providers and negotiate payment terms.

Specifically, within the geographic area covering Requester's request, DPW contracts with five different Managed Care Organizations (MCOs). DPW pays the MCOs a negotiated rate, a "Capitation Rate," and the MCOs are obligated to establish and maintain a provider network to ensure access to dental care for Medicaid beneficiaries. In this regard, DPW delegates its governmental duties to the MCOs, and the MCOs accept these undertakings. Pursuant to the HealthChoices Agreement, the MCOs expressly agree:

> to participate in the [Medicaid program] and to arrange for the provision of those medical and related services essential to the medical care of those individuals being served, and to comply with all federal and Pennsylvania laws generally and specifically governing participation in the [Medicaid program.] The [MCO] agrees that all services provided hereunder must be provided in the manner prescribed by 42 U.S.C. § 300e(c). The [MCO] agrees to comply with all applicable rules, regulations, and Bulletins promulgated under such laws including, but not limited to, 42 U.S.C. § 300e; 42 U.S.C. § 1396 et seq; 62 P.S. § 101 et seq.; 42 CFR Parts 431 through 481 and 45 CFR Parts 74, 80, and 84, and [DPW's] regulations. . . .

(Reproduced Record (R.R.) at 715a.)

The MCOs, on behalf of DPW, then enter into subcontract agreements with business entities (Subcontractors). Pursuant to these agreements, the MCOs pay the Subcontractors a per-member, per-month rate, known as the "MCO Rate," which ostensibly is drawn from the MCOs' Capitation Rates. The Subcontractors, in turn, secure written agreements with and pay negotiated rates to the dental providers for services rendered to the MCOs' enrollees.[3] As a general proposition, the

---

**1.** Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101–67.3104.

**2.** For a general discussion on Medicaid program, *see, e.g., Lukes v. Department of Public Welfare,* 976 A.2d 609, 623 and n. 10 (Pa. Cmwlth.2009); *Commonwealth v. Lubrizol Corp. Employee Benefits Plan,* 737 A.2d 862, 869–70 (Pa.Cmwlth.1999); *Oriolo v. Depart-* *ment of Public Welfare,* 705 A.2d 519, 520 (Pa.Cmwlth.1998).

**3.** In a very clear manner, the Majority charts these parties' relationship as follows: **DPW→ MCOs→ Subcontractors→ Providers.** The "→" symbol denotes a contractual agreement, with their being a total of three different contracts.

MCOs and the Subcontractors are not obligated to contract with any willing dental provider. The rates paid to individual providers are not prescribed by law, but are determined in negotiations between the individual dental provider and the Subcontractors, and may vary from one provider to the next. *See* 42 C.F.R. § 438.12(a), (b)(2).

Notably, these "middlemen" (*i.e.*, the MCOs and Subcontractors) are in the business of realizing marginal profit gains. For example, if an MCO is able to control costs within the level of the capitation revenue, then it would earn a profit; if not, the MCO would suffer a loss. *Lukes v. Department of Public Welfare*, 976 A.2d 609, 613 (Pa.Cmwlth.2009). Further, the rates paid by an MCO affect the Capitation Rate and payments DPW would make to the MCO in future years; a higher amount paid by the MCO correlates into a higher Capitation Rate payment by DPW to the MCO. *Id.* Ultimately, an increase in total Capitation Rate payments results in an increase to the total cost of the Medicaid program to DPW and the taxpayers of Pennsylvania. *Id.* at 613–14. In any event, the public funds originate with DPW, and no matter how many private entities the funds pass through, the funds end up in the hands of those performing the actual dental services and are the same funds that began with DPW. That is, public funds are used to pay for public dental insurance.

Although based on a different rationale, I join the Majority in its conclusion that the Capitation Rates negotiated between DPW and the MCOs are subject to disclosure. (Maj. op. at 1123–27.) I respectfully disagree with the Majority that the MCO Rates negotiated between the MCOs and the Subcontractors cannot be dis-

closed. In my view, the MCO Rates qualify as "financial records" under section 102 of the RTKL, 65 P.S. § 67.102, and pursuant to section 708(c) of the RTKL, 65 P.S. § 67.708(c), the exceptions contained in section 708(b) prohibiting disclosure are inapplicable. I further believe that as a result of the MCO Rates having obtained financial records status, the inquiry in this case regarding those rates is at an end; there is no independent exemption under the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. §§ 5301–5308, (Trade Secrets Act), because this body of law is already codified in sections 102 and 708(b)(11) of the RTKL, 65 P.S. §§ 67.105, 708(b)(11). Accordingly, and unlike the Majority, I would conclude that the Office of Open Records (OOR) did not err in ordering the disclosure of the MCO Rates.

"[T]he objective of the RTKL is to empower citizens by affording them access to information concerning the activities of their government." *Levy v. Senate of Pennsylvania*, —— Pa. ——, ——, 65 A.3d 361, 381 (2013) (internal quotation marks and citation omitted). When compared to the former Right to Know Act of 1957 (Right to Know Act),[4] the current RTKL, enacted in 2008, "demonstrate[s] a legislative purpose of expanded government transparency through public access to documents." *Id.* at ——, 65 A.3d at 381. "[C]ourts should liberally construe the RTKL to effectuate its purpose of promoting access to official government information in order to prohibit secrets, scrutinize actions of public officials, and make public officials accountable for their actions." *Id.* (internal quotation marks and citation omitted).

From a requester's standpoint, the most potent provisions of the RTKL are argu-

---

**4.** Act of June 21, 1957, P.L. 390, *formerly* 65 P.S. §§ 66.1–66.9, repealed by Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101–67.3104.

ably sections 102 and 708(c) pertaining to financial records. In relevant part, a "financial record" is defined in section 102 of the RTKL as "any account, voucher, or contract dealing with ... the receipt or disbursement of funds by an agency." Section 708(c) of the RTKL permits financial records to be redacted in certain enumerated circumstances, but, as the Majority points out, none of these circumstances are present in this case. (Maj. op. at 1124, 1125.) Further, section 708(c) of the RTKL states that all of the 30 exemptions from disclosure contained in subsection (b) "shall not apply to financial records...." Therefore, our legislature placed paramount significance in financial records, deeming them to be *prima facie* public records that should be disclosed to the public, with the sole exception that disclosure would violate the nonpublic nature of a document as provided for "in Federal or State law, regulation or judicial order or decree." Section 306 of the RTKL, 65 P.S. § 67.306.

The language defining a financial record in section 102 of the current RTKL is not foreign to our legislature or to this Court. In fact, section 1 of the former Right to Know Act employed identical language to define a "public record" as "any account, voucher, or contract dealing with ... the receipt or disbursement of funds by an agency...." Section 1 of the prior Right to Know Act, *formerly* 65 P.S. § 66.1. Remarkably similar to the current RTKL, the former Right to Know Act granted unrestricted access to a "public record," with a few exceptions, including where disclosure was "prohibited, restricted or forbidden by statute law or order or decree of court...." *Id.* Consequently, the definition of a "financial record" under the current RTKL duplicates verbatim the definition of a "public record" under the former Right to Know Act, and the two terms embody functionally equivalent concepts.

"If the Legislature, in a later statute, uses the same language used in a prior statute which has been construed by the courts, there is a presumption that the language thus repeated is to be interpreted in the same manner such language had been previously interpreted when the court passed on the earlier statute." *Delaware County v. Schaefer,* 45 A.3d 1149, 1155 (Pa.Cmwlth.2012) (*en banc*).

In *Lukes,* the requester sought contractual agreements, "Provider Agreements," between an MCO and health care providers in order to ascertain the negotiated payment rates. In construing the verbiage delineating a "public record," this Court concluded that the contractual agreements and payment rates constituted a "contract dealing with ... the receipt or disbursement of funds by an agency...." We reasoned, in pertinent part, as follows:

> Our Supreme Court has concluded that the first category, *i.e.,* documents dealing with the receipt or disbursement of funds, should be interpreted expansively.... This category of documents should be broadly construed and need only constitute records evidencing disbursement of government money....
>
> * * *
>
> Applying agency principals to the instant matter, we believe the Provider Agreements at issue are the product of the agency relationship between DPW and the [MCO]. The HealthChoices Agreement [*i.e.,* the contractual agreement between DPW and the MCO] constitutes a manifestation by DPW that the [MCO] shall administer the HealthChoices Program and the acceptance of the undertaking by the [MCO]. Since Pennsylvania's [Medicaid] program must meet all requirements of the federal and state law in order to acquire funding,

DPW established strict controls in the HealthChoices Agreement....

Through Provider Agreements, the [MCO] agrees to pay hospital providers negotiated rates for medical services rendered to Medicaid enrollees....

In doing this, the [MCO] is fulfilling DPW's duties to administer the [Medicaid] program. Had DPW contracted directly with the hospitals to provide medical services, there would be no doubt that the Provider Agreements are public records subject to disclosure. While the HealthChoices Agreement between DPW and the [MCO] expressly states that the [MCO] is not to hold itself out as an agent or representative of DPW and that the relationship between the parties is that of independent contracting parties, the fact remains that the [MCO] is performing a duty that would ordinarily be handled by DPW. In essence, the [MCO] stands in the shoes of DPW in administering the HealthChoices Program. We, therefore, conclude that the Provider Agreements are the product of the agency relationship that exists between DPW and the [MCO].

976 A.2d at 621 and 623–24 (internal quotation marks, citations, and footnotes omitted). On this rationale, we concluded in *Lukes* that the provider agreements and payment rates evidenced the receipt and disbursement of public funds and, therefore, should be disclosed to the public.

Because this Court in *Lukes* interpreted language identical to that presently before this Court, and applied that language to facts indistinguishable from those currently before this Court, I find our reasoning in *Lukes* highly persuasive, if not binding, under principles of *stare decisis*. Following *Lukes*, I would conclude that Requester's request for MCO Rates is a request for "financial records" under section 102 of the RTKL because agency law dictates that the MCOs and Subcontractors stand in the shoes of DPW and receive and disburse public funds.

"When our Court renders a decision on a particular topic, it enjoys the status of precedent. The danger of casually discarding prior decisions is that future courts may regard the new precedent as temporary as well." *Hunt v. Pennsylvania State Police*, 603 Pa. 156, 164, 983 A.2d 627, 637 (2009). In order to pay due respect to this Court's precedent, it is incumbent upon the Majority to provide a compelling reason to overrule *Lukes*, specifically explaining why that case was wrongly decided. (Maj. op. at 1127.)[5] I do not believe the Majority accomplishes this task.

Without appreciating the fact that *Lukes'* discussion of receipt and disbursement of funds concerns the same exact statutory language that this Court is now asked to interpret, the Majority cites case law that distinguished or declined to follow *Lukes* insofar as *Lukes* determined the extent to which records can be considered

**5.** Our Supreme Court further explained:

Certainly, there are legitimate and necessary exceptions to the principle of stare decisis. But for purposes of stability and predictability that are essential to the rule of law, the forceful inclination of courts should favor adherence to the general rule of abiding by that which has been settled. Moreover, stare decisis has "special force" in matters of statutory, as opposed to constitutional, construction, because in the statutory arena the legislative body is free to correct any errant interpretation of its intentions, whereas, on matters of constitutional dimension, the tripartite design of government calls for the courts to have the final word.

603 Pa. at 165, 983 A.2d at 637–38 (citation omitted).

to be within an agency's control when a third party possesses them. (Maj. op. at 1125 n. 12, citing *Honaman v. Lower Merion Township*, 13 A.3d 1014, 1019–22 (Pa. Cmwlth.2011); *In re Silberstein*, 11 A.3d 629, 632 and n. 8 (Pa.Cmwlth.2011); *Office of the Budget v. Office of Open Records*, 11 A.3d 618, 621–22 (Pa.Cmwlth.2011)).[6] In this regard, *Lukes* was obviously superseded by a change in statutory language. Section 1 of the former Right to Know Act defined a record, albeit vaguely, as "[a]ny document maintained by an agency, in any form, whether public or not...." In contrast, section 506(d)(1) of the RTKL now states that "[a] public record that is ... in the possession of a party with whom the agency has contracted to perform a governmental function on behalf of the agency, and which directly relates to the governmental function ... shall be considered a public record of the agency for purposes of this act." 65 P.S. § 67.506(d)(1). However, and most importantly, there is no dispute that DPW possesses the requested documents in this case, (Maj. op. at 1123–24); consequently, the Majority's reliance upon its cited case law to abrogate *Lukes* on a completely unrelated and separate point of law is misplaced. Nothing in our decisions in *Honaman, In re Silberstein,* or *Office of the Budget* question or otherwise undermine *Lukes'* precedential value

and holding that MCOs and related entities receive and disburse agency funds.[7]

The Majority also uses canons of statutory construction to construe the phrase, **"any ... contract dealing with ... the receipt or disbursement of funds by an agency,"** (emphasis added), in a manner that differs from that in *Lukes.* Emphasizing the word "by," the Majority concludes that the MCO Rates are not funds disbursed *"by* an agency" because the funds are being passed between two private contracting entities—*i.e.,* from the MCOs to the Subcontractors. (Maj. op. at 1126–27.) Without engaging in extensive grammatical discourse, I am not convinced with the Majority's interpretation because it effectively renders the words "any," "dealing," and "disbursement" superfluous and without meaning, and also ignores the fact that the funds originate with DPW. *See Concerned Citizens for Better Schools v. Brownsville Area School District,* 660 A.2d 668, 671 (Pa.Cmwlth.1995) ("[W]henever possible, the courts must interpret statutes to give meaning to all of their words and phrases so that none are rendered mere surplusage."). Instead, I believe that section 102 of the RTKL is broad enough to include public funds that trickle down through contractor and subcontractor contracts ("any contract") because these contracts nevertheless "deal" with, or simply pass along down the line,

---

**6.** In *Honaman,* this Court differentiated *Lukes* when the addressing the issue of whether a township had possession or control of tax records that were in the possession of a tax collector. In *In re Silberstein,* we distinguished *Lukes* in determining whether requested records contained on a township's commissioner's personal computer are public records in the possession or control of the township. Likewise, in *Office of the Budget,* we concluded that *Lukes* is no longer applicable on the issue of government possession of a record because the concept of possession was ambiguous under the former Right to Know

Act but the current Right to Know Law explicitly defines the term.

**7.** Additionally, the Majority points out that there are "substantial differences" between the current RTKL and the former Right to Know Act and contends that the "most obvious" difference is the "severe restriction on redaction of 'financial records.'" (Maj. op. at 1125.) I am unable to discern how the manner in which financial records can or cannot be redacted has any relevant impact in determining whether the MCO Rates are financial records in the first place.

the "disbursement of funds by an agency." *See, e.g., Associated Builders & Contractors, Inc. v. Pennsylvania Department of General Services,* 747 A.2d 962, 965 (Pa. Cmwlth.2000) (interpreting "any contract dealing with receipt or disbursement of funds") (concluding that "an agency may not shield a public document from disclosure by contracting with a third party that subsequently [disburses] the government funds. By paying through a third party, an agency does not change the character of those funds from public to private."). In my view, there is no textual basis in the current RTKL to discard *Lukes'* analysis on this point as obsolete or wrongly decided.

Relatedly, and in a cursory fashion, the Majority concludes: "That MCOs disbursed funds they received from DPW to their subcontractors does not render the MCOs mere conduits for public funds. Based on the language of the current RTKL, the funds lose their character as public funds once they leave an agency's hands and enter the public sector." (Maj. op. at 1127.)

Upon review, I am unable to locate any statutory language in the definition of financial records or the RTKL that supports the Majority's position. And I cannot decipher how public funds designated for a public purpose become private funds when in the hands of a private party when that private party is obligated to use the funds for a public purpose. On comparison, I find our examination of this topic in *Lukes* more persuasive than that of the Majority:

> There is no question that the Medicaid funds for the HealthChoices Program derive from federal and state funds. DPW argues, however, that once the public money is received by the [MCO], a private entity, the money belongs to the [MCO] and is private. Had the purpose of the money been simply to

provide funding to private MCOs or HMOs ... we would agree that the money became private once in the hands of those entities and how the money was spent would not be subject to disclosure. However, that is not the case here. The purpose of the public money disbursed by DPW is to provide medically necessary services to Medicaid recipients. The [MCO] does not administer these services, but instead acts as an intermediary by contracting with provider hospitals to provide such services. **Until the public funding reaches the intended Medicaid recipient, the money remains public.**

\* \* \*

The Provider Agreements reflect the expenditure of public funds for the benefit of Medicaid beneficiaries. DPW cannot circumvent the disclosure of this money trail by contracting indirectly through ... MCOs or HMOs. **Private entities that receive or control public funds have a duty to account for their handling of those funds. Disclosure of the Provider Agreements is the only way to ensure such accountability. To shield such documents from review would circumvent the public's ability to determine how tax dollars are spent.**

*Lukes,* 976 A.2d at 625 (emphasis added).

For all of these reasons, I would conclude that the MCO Rates and the agreements containing them are "financial records" for purposes of section 102 of the RTKL. As explained above, because the MCO Rates are financial records, the numerous exemptions contained in section 708(b) of the RTKL, including confidential proprietary information and trade secrets, are inapplicable.

Nonetheless, the Majority concludes in its discussion on Capitation Rates that the Trade Secrets Act, even though codified in

section 708(b)(11) of the RTKL, is an independent and "stand-alone statutory basis for protection" from disclosure. (Maj. op. at 1124–25, 1131). I do not agree.

Section 708(b)(11) of the RTKL exempts from disclosure "[a] record that constitutes or reveals a trade secret," but, pursuant to section 708(c), this exception "shall not apply to financial records...." Section 102 of the RTKL defines a "trade secret" as follows:

"Trade secret." Information, including a formula, drawing, pattern, compilation, including a customer list, program, device, method, technique or process that:

(1) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The term includes data processing software obtained by an agency under a licensing agreement prohibiting disclosure.

*Id.*

The Trade Secrets Act defines a trade secret as follows:

"Trade secret."—Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa.C.S. § 5302.

Minus the last clarifying sentence in section 708(b)(11) of the RTKL, the definition of a trade secret in the RTKL and the Trade Secrets Act is identical. Although financial records may be exempt from disclosure where disclosure would "conflict with any other federal or state law," 65 P.S. § 67.3101.1,[8] our legislature expressed its clear intention to incorporate and codify the Trade Secrets Act into sections 102 and 708(b)(11) of the RTKL. *See Office of Governor v. Scolforo,* 65 A.3d 1095, 1101–02 (Pa.Cmwlth.2013) (concluding that where our legislature expressed its intent to codify the common law deliberative process privilege into section 708(b)(10)(i) of the RTKL, the legislature demonstrated its intent to specifically exempt the common law deliberative process privilege from disclosure). Since the two concepts are one and the same, intermingled into a collective and inseparable whole, I do not believe that the trade secrets mentioned and defined in the RTKL in any way "conflicts" with the trade secrets under the Trade Secrets Act.

Our legislature expressly stated in section 708(c) of the RTKL that trade secrets are not an exception to disclosure of financial records. There is no conceivable basis upon which to conclude that the legislature intended the more generally applicable Trade Secrets Act to override and displace this specific provision of the RTKL. Indeed, it would be anomalous for our legislature to explicitly exclude trade secrets as an exception to disclosure of financial records in section 708(c) of the RTKL, while simultaneously implying that trade secrets

---

8. Section 3101.1 of the RTKL states: "If the provisions of this act regarding access to records conflict with any other federal or state law, the provisions of this act shall not apply."

are an exception requiring disclosure of the same financial records in section 3101.1 of the RTKL. *See Ling v. Department of Transportation,* 79 A.3d 1, 5 (Pa.Cmwlth. 2013) ("Given our holding that the Driveway Immunity Provision specifically confers DOT with statutory immunity, we need not determine whether an exception to sovereign immunity is applicable.... [I]t would be anomalous for our legislature to grant immunity in one statute and simultaneously abrogate that immunity in another statute."). Therefore, where, as here, financial records are involved, I believe that section 708(c) of the RTKL trumps any notion of an independent exception for trade secrets under the Trade Secrets Act.

Accordingly, because the contracts containing the MCO Rates are financial records and no exception to disclosure is applicable to this case, I would affirm the OOR's determination requiring DPW and the pertinent parties to disclose the MCO Rates. On these grounds, I respectfully dissent.