**Sandvik, Inc. v. Mecca C & S, Inc.**

*Jessica A. Stow*, for plaintiff.
*Joel M. Wolff*, for defendants.

NEALON, *J.*, May 21, 2014—A manufacturer of custom-engineered power springs has sued its former employee for alleged misappropriation of trade secrets, and "upon information and belief" based upon its review of the ex-employee's business website, asserts that the defendant employee currently sells spring design software which improperly incorporates the manufacturer's proprietary information in contravention of his employment agreements and Pennsylvania trade secrets law. The former employee contends that he has developed superior spring technology software utilizing publicly available engineering concepts and his own ingenuity. The ex-employee has appealed the special trial master's discovery ruling requiring him to provide the manufacturer access to his spring technology software, and argues that the grant of such discovery will enable the manufacturer to discover and possibly replicate his proprietary information and confidential formulas that are reflected in that software.

In trade secrets discovery disputes, the party resisting discovery must first establish that the material sought constitutes protected proprietary information, and if that party does so, the burden shifts to the requesting party to demonstrate a compelling need for that discovery which outweighs the harm of its disclosure. The parties' submissions indicate that the defendant employee's

software contains his trade secrets and confidential equations. The manufacturer contends that it must, nevertheless, access that software to prove its trade secrets claims, while the ex-employee submits that the manufacturer has not demonstrated that its compelling need for such discovery outweighs the harm that the employee will suffer from the disclosure of his software to his business competitor and litigation adversary.

To resolve the parties' circular arguments regarding the protected statuses of their trade secrets and software, a spring technology software expert will be appointed by the court to review the parties' respective spring technology software, to determine whether the defendant employee's software impermissibly integrates the manufacturer's trade secrets as alleged, and pursuant to the protocol set forth in this memorandum and order, to prepare a report of the expert's findings. After the expert has provided that report to the defense, the former employee may either (a) furnish it to the manufacturer or (b) file his objection(s) to its production to the manufacturer. In the latter event, the expert's report will be submitted for an *in camera* review by the court to determine the discoverability of the report and the software at issue.

## I. FACTUAL BACKGROUND

Plaintiff, Sandvik, Inc. ("Sandvik"), maintains a business unit, Sandvik Materials Technology, which designs and manufactures spring products, including custom-engineered power springs. (Docket entry no. 1 at ¶ 2). From October 1995 to July 2009, defendant, William Mecca ("Mecca"), was employed by Sandvik as a process engineer, senior production facilitator,

manufacturing engineering manager, and Spring China operations manager. (*Id.* at ¶ 3; Docket entry no. 3 at ¶ 3). In November 2009, Mecca formed defendant, Mecca C & S, Inc., which is engaged in the business of selling custom-engineered spring technology software. (*Id.* at ¶¶ 4,44).

Sandvik claims to have developed "spring technology software" which "employs an N-value term that allows the otherwise theoretical spiral spring calculations to have 'real world' application by creating idealized straight line torque and stress information." (Docket entry no. 1 at ¶14). Sandvik avers that it has also designed "a Finite Element Analysis ("FEA") that is capable of application to spring technology software and modeling." (*Id.* at ¶ 16). According to Sandvik, its "software is a compilation of numerous data points, formulas and calculations, including use of a refined N-value term, which took Sandvik...many years and substantial funds to develop," and "that allows it to manufacture custom-engineered springs based on the design specifications of its clients." (*Id.* at ¶17).

During the course of his employment with Sandvik, Mecca allegedly "worked on development of spring technology and software" and "helped develop the confidential and proprietary software that allows [Sandvik] to manufacture custom-engineered springs based on the design specifications of its clients." (*Id.* at ¶¶ 39, 40). In that capacity, he ostensibly had access to Sandvik's "technology related to the process for developing and producing spiral springs, software, design parameters, empirical data on endurance and performance, and application and use of the N-value term in spring development software

programming, including technology related to prestressed and precoiled springs." (*Id.* at ¶ 37). While employed by Sandvik, Mecca reportedly "executed several agreements that prohibited him from disclosing or using Sandvik's trade secrets and confidential business information other than in furtherance of his employment at Sandvik." (*Id.* at ¶ 28). Specifically, Mecca's employment agreements barred him divulging or using Sandvik's "confidential or proprietary information" without Sandvik's "prior written approval," and required him to return any such information to Sandvik upon the termination of his employment.[1] (*Id.* at ¶¶ 31, 33).

Sandvik contends that Mecca's business "currently advertises online at http://www.spiral-spring.com/ as 'Spiral Springs Solutions,' offering consulting services, training, Power Spring Design services, and spring design software." (*Id.* at ¶ 45). It is averred that Mecca's website offers for sale Mecca's "Power Spring Design Software" and "Spiral Hair Spring Design Software" which are described as using "numerous formulas and FEA methods." (*Id.* at ¶¶ 46-47). Based "[u]pon information and belief," Sandvik asserts that "the Power Spring Design Software and Spiral Hair Spring Design Software available for sale on the Mecca C & S website incorporates and uses Sandvik's confidential and proprietary spring technology software, including the numerous, complex calculations that Sandvik has spent substantial time refining." (*Id.*

---

1. Mecca's employment agreements with Sandvik define the phrase "[c]onfidential or proprietary information" as any "information learned or acquired by [Mecca] during [his] employment with Sandvik that is not generally known in Sandvik's industry including, but not limited to,... research activities,...designs, ideas, trade secrets,...data, records and formulas." (*Id.* at ¶ 32).

at ¶ 50). More particularly, Sandvik maintains that Mecca's software improperly integrates Sandvik's "use of the N-value calculation term," "application of FEA to spring technology," and "use of the refined N-value term necessary to allow[ ] theoretical calculations to have 'real world' application." (*Id.* at ¶¶ 53, 54, 56, 58).

Sandvik filed a complaint against Mecca asserting causes of action for breach of the non-disclosure provisions of his employment contracts, misappropriation of trade secrets and confidential business information under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. C.S.A. §5301, et seq., and unjust enrichment. (*Id.* at ¶¶ 71-107). In connection with those claims, Sandvik "sought information regarding [Mecca's] development and sales of the spring software at issue, such as information transmitted over [Mecca's] website, http://www.spiral-spring.com/," and demanded production of Mecca's spring design "software and the design and development of [Mecca's] spring software." (Docket entry no. 9 at pp. 2-3). After Mecca objected to that software discovery on the ground that it seeks his own "trade secrets and confidential information," (Docket entry no. 10 at p. 3), Sandvik presented a motion to compel discovery to the special trial master, while Mecca submitted a motion for a protective order prohibiting any such discovery. (Docket entry no. 5; docket entry no. 7, exhibit C). On December 16, 2013, the master denied Mecca's motion for a protective order, and granted Sandvik's discovery motion subject to a confidentiality stipulation.[2] (Docket entry no. 6).

---

2. Sandvik's proposed confidentiality order contains detailed provisions designed to protect the parties' trade secrets and confidential information, and limits the disclosure of any such material to the court,

Mecca has appealed the master's discovery ruling, and argues that he has "developed superior software" in the form of his "Power Spring Design Software and Special Hair Spring Design Software" by utilizing FEA and N-value term concepts that are publicly available. (Docket entry no. 10 at pp. 1,7-10). Mecca asserts that the grant of access to his spring technology software will result in the disclosure of Mecca's own "trade secrets and confidential information" to Sandvik. (*Id.* at p. 3). To that end, he states that "Mecca C & S purchased a third party encryption software allowing licenses sold to clients to be date protected, hardware locked to each specific computer, and making its trade secret equations invisible to users." (*Id.* at p. 8). Sandvik maintains that the discovery sought is relevant and necessary for the resolution of its claims, and that the necessity for such discovery outweighs any potential harm resulting from that disclosure since the software discovery will be governed by a confidentiality order. (Docket entry no. 9 at pp. 1, 5-8).

The circular reasoning surrounding the parties' discovery dispute can best be summarized as follows: Sandvik contends that Mecca misappropriated Sandvik's trade secrets by including its confidential information in Mecca's spring technology software, and seeks access to that software in order to prove its claims; whereas Mecca argues that Sandvik's requested discovery will improperly

---

the parties' counsel and counsel's employees, non-industry testifying or consulting experts who have executed a non-disclosure agreement, and "witnesses or potential witnesses, to the extent they were the creator sendor or recipient of the confidential discovery material." (Docket entry no. 6, exhibit A at ¶¶ 10-11). The confidentiality stipulation requires those individuals to return or destroy the originals and all copies "of documents designated as confidential discovery material" within thirty days "after the final termination of this action." (*Id.* at ¶18).

enable Sandvik to obtain Mecca's trade secrets and proprietary information. As a potential resolution, the undersigned suggested at the time of oral argument that the parties agree to the court-appointment of an appropriate software consultant (a) to conduct an *in camera* review of the parties' respective software, (b) to ascertain whether Mecca's software incorporates Sandvik's trade secrets as alleged, and if the expert concludes that Mecca's spring technology software does integrate Sandvik's proprietary information, (c) to advise Mecca in the first instance of that finding by providing him with a copy of the expert's written report. In the event that Mecca objects to the disclosure of the relevant software information to Sandvik, Mecca would be entitled to submit his objections to the undersigned, who would also conduct an *in camera* review of the expert's report, so that the merits of Mecca's objections could be addressed. Conversely, if the court-appointed software discovery master concludes that Mecca's software does not utilize Sandvik's trade secrets or confidential information as alleged, the parties' discovery dispute, and presumably this litigation, would become moot. (Transcript of Proceedings ("T.P.") on 2/14/14 at pp. 7-11, 14-17, 31-32). Counsel for the parties were directed to advise the undersigned within thirty (30) days whether they could agree to the appointment of such a discovery master to undertake the suggested software analysis. (*Id.* at pp. 34-37).

By letter dated March 13, 2014, Sandvik reported that it "is amenable to engaging a court-appointed expert to address the merits of the case such as whether trade secret information was misappropriated," but that Mecca was only willing to retain such an expert "to address the

limited issue of whether [Mecca] should produce the discovery requested by Sandvik." (Correspondence from Jessica A. Stow, Esquire to Judge Terrence R. Nealon dated 3/13/14). Sandvik contends "that an expert is unnecessary for such limited purposes, and the cost and delay associated with that exercise is not warranted." (*Id.*). On March 14, 2014, Mecca submitted his reply in which he stated that he "agrees with the court's proposal" concerning the appointment of a software consultant as "a potential solution to the issues raised by [Mecca's] motion" for a protective order. (Correspondence from Joel M. Wolff, esquire to judge Terrence R. Nealon dated 3/14/14). Hence, the parties' software discovery dispute awaits resolution.

## II. DISCUSSION

### (A) STANDARD OF REVIEW

Pursuant to Lacka. Co. R.C.P. 4000.1, discovery motions must initially be presented to and decided by the court-appointed special trial master whose ruling "may be appealed *de novo*" to the court of common pleas within ten days of the master's decision. *Fratzola v. Klepadlo*, 26 Pa. D. & C. 5th 533, 537-538 (Lacka. Co. 2012). Under Pa.R.C.P. 4003.1, "discovery is liberally allowed with respect to any matter, not privileged, which is relevant to the cause being tried." *Berg v. Nationwide Mutual Insurance Company. Inc.*, 44 A.3d 1164, 1178 n. 8 (Pa. Super. 2012), *app. denied*, 65 A.3d 412 (Pa. 2013). Information is relevant "if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Kelin v. Aronchick*,

85 A.3d 487,498 (Pa. Super. 2014); *Smith v. Morrison*, 42 A.3d 131, 137 (Pa. Super. 2012), *app. denied*, 57 A.3d 71 (Pa. 2012).

The relevancy standard applicable to discovery is necessarily broader than the standard used at trial for the admission of evidence. *Com. v. TAP Pharmaceutical Products, Inc.*, 904 A.2d 986, 994 (Pa. Cmwlth. 2006); *George v. Schirra*, 814 A.2d 202, 205 (Pa. Super. 2002). The party objecting to discovery generally bears the burden of establishing that the requested information is not relevant or discoverable. *Koken v. One Beacon Insurance Company*, 911 A.2d 1021, 1025 (Pa. Cmwlth. 2006); *Yadouga v. Cruciani*, 66 Pa. D. & C. 4th 164, 168 (Lacka. Co. 2004). Any doubts regarding relevancy are to be resolved in favor of discovery. *Ario v. Deloitte & Touche, LLP*, 934 A.2d 1290, 1293 (Pa. Cmwlth. 2007).

Although trade secrets are afforded protection under the law, there is "no absolute privilege or unconditional bar as to disclosure of such matters." *Crum v. Bridgestone/ Firestone No. Amer. Tire, LLC*, 907 A.2d 578, 585 (Pa. Super. 2006). Pennsylvania Rule of Civil Procedure No. 4012 governs protective orders and states that "for good cause shown" the court may issue an order "that a trade secret or confidential research, development or commercial information shall not be disclosed or [shall] be disclosed only in a designated way." Pa.R.C.P. 4012(a) (9). "If a party establishes that information sought is a trade secret or confidential business information, then it has established good cause under Rule 4012(a)(9)." *Markwest Liberty Midstream & Resources, LLC v. Clean Air Council*, 71 A.3d 337,343 (Pa. Cmwlth. 2013).

Pennsylvania employs a shifting burden of persuasion relative to discovery requests and objections implicating trade secrets. Under that standard, the party resisting discovery must first establish that the information sought is a protected trade secret, and if it does so, the burden shifts to the requesting party to demonstrate, by competent evidence, that there is a compelling need for that information, and that the necessity outweighs the harm of disclosure. *Markwest Liberty Midstream & Resources*, 71 A.3d at 344; *Crum*, 907 A.2d at 587. The questions of whether discovery of trade secrets is to be allowed, and the form of any protection to be afforded, are matters vested to the discretion of the trial court. *Rohm and Haas Company v. Lin*, 992 A.2d 132, 143 (Pa. Super. 2010), *cert. denied*, 132 S.Ct. 852 (U.S. 2011); *Crum*, 907 A.2d at 586.

### (B) TRADE SECRETS DISCOVERY

Mecca submits that the "decision of [special trial] master Henry P. Burke allows Sandvik to circumvent the law by avoiding the applicable burden shifting scheme which requires Sandvik to demonstrate by competent evidence that there is a compelling need for the documents and information it requests of [Mecca], and that such necessity outweighs the harm of disclosure." (Docket entry no. 1 at p. 4). Mecca asserts that "Sandvik has no legitimate need for [Mecca's] trade secret and confidential information as it has not suffered any recoverable loss as a result of [Mecca's] market and sale of [Mecca's] software." (*Id.* at p. 11). Sandvik counters that its access to Mecca's spring software is necessary "to determine the extent of [Mecca's] misappropriation" of Sandvik's trade secrets,

and that "the discovery sought is central to resolution of this case." (Docket entry no. 9 at p. 6). Sandvik further argues that the necessity for this discovery outweighs the harm of disclosure since "[a]ny potential harm from the disclosure of [Mecca's] trade secret information is significantly lessened — if not eradicated — by the entry of the stringent protective order." (*Id.* at p. 8).

As noted above, "[d]iscovery in trade secret litigation is permissible so long as the information sought to be obtained is reasonably related to the underlying cause of action and the need for this information outweighs any harm that may occur as a result of its release." *Rohm and Haas Company*, 992 A.2d at 143 (citing *Crum, supra*). Pennsylvania has adopted the definition of a trade secret set forth in comment (b) to Section 757 of the Restatement (Second) of Torts, which states that "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which give him an opportunity to obtain an advantage over competitors who do not know or use it." *Crum*, 907 A.2d at 585 (quoting *Pestco. Inc. v. Associated Products, Inc.*, 880 A.2d 700, 706 (Pa. Super. 2005)). Section 5302 of PUTSA similarly defines trade secrets as "[i]nformation, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that: (1) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; [and] (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 12 Pa.C.S.A. 5302. *See also Krafft v. Downey,*

68 A.3d 329,337 (Pa. Super. 2013), *app. denied*, 83 A.3d 169 (Pa. 2013).

The following factors are to be considered in determining whether the information sought is to be granted trade secret status: (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by employees and others in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Com., Department of Public Welfare v. Eiseman*, 85 A.3d 1117, 1126 (Pa. Cmwlth. 2014); *Crum*, 907 A.2d at 585. "Whether information qualifies as a 'trade secret' is a highly fact-specific inquiry that cannot be distilled to a pure matter of law." *Eiseman, supra*. The crucial criteria for determining whether information constitutes a trade secret "are substantial secrecy and competitive value to the owner." *Markwest Liberty Midstream & Resources*, 71 A.3d at 344; *Crum*, 907 A.2d at 585.

The materials submitted by the parties reflect that Mecca's spring software does, in fact, contain trade secret information. Mecca's software embodies formulas and methods that he claims to have developed in the power springs industry, and which provide Mecca with a competitive advantage in that field. The components of Mecca's particular software are not generally known within or outside his business since Sandvik is obviously unaware of the details of those program elements, even

though it has described itself as "an industry leader in the design and manufacture of custom-engineered power springs." (Docket entry no. 1 at ¶ 2). Mecca has undertaken measures to protect the secrecy of that proprietary information through his purchase and use of third party encryption software. Mecca also expended considerable resources in developing his software and "invested over 400 hours into programming and development prior to release [of the software], and numerous updates and improvements since the initial release." (Docket entry no. 10 at p. 9). Additionally, Mecca's spring technology software cannot be easily duplicated, as evidenced by the self-proclaimed industry leader's continuing efforts to secure it in discovery. Consequently, Mecca has established that the software information sought by Sandvik contains protected trade secrets.

Nevertheless, Mecca's spring technology software is clearly relevant to Sandvik's claims that Mecca has misappropriated Sandvik's trade secrets. *See George*, 814 A.2d at 205 (holding that developer of "flow-aid" product for use in steel making process satisfied relevancy standard for discovery of former employee's home laboratory notes which allegedly contained developer's trade secrets to alleviate the agglomeration of lime and other powdered constituents of steel manufacturing). To gain access to Mecca's spring software, Sandvik must further demonstrate that its need for that information outweighs the harm of such disclosure. Although Sandvik contends that any potential harm to Mecca is negated by its proposed confidentiality order, it cannot be denied that "the confidentiality of potentially privileged information is irreparably lost" once it is disclosed to litigants and their

experts since "the reality is that there is no effective remedy for a breach of the existing protective order." *Crum*, 907 A.2d at 584 (citing *Dibble v. Penn State Geisinger Clinic. Inc.*, 806 A.2d 866, 870 (Pa. Super. 2002), *app. denied*, 573 Pa. 666, 820 A.2d 705 (2003)).

In the context of electronic discovery, courts in other jurisdictions have appointed forensic experts to access the responding party's electronically stored information in an effort to address electronic discovery disputes without unilaterally disclosing that party's confidential or privileged information to its adversary in litigation. Following a procedure first articulated in *Playboy Enterprises. Inc. v. Welles*, 60 F. Supp. 2d 1050, 1054-1055 (S.D. Cal. 1999), those courts have appointed a forensic expert, from a list of proposed experts submitted by the parties, to review the objecting party's digital files in order to identify any relevant and responsive material. *See United Factory Furniture Corp. v. Alterwitz*, 2012 WL 1155741, at *5 (D. Nev. 2012); *Bank of Mongolia v. M & P Global Financial Services. Inc.*, 258 F.R.D. 514, 520 (S.D. Fla. 2009). The forensic consultant serves as an officer of the court and is required to sign a protective order to insure against the inadvertent waiver of any privilege or objection by the responding party. *Alterwitz, supra*, at *6; *Commercial Law Corp.. P.C. v. Federal Deposit Ins. Corp.*, 2012 WL 137835, at *3 (E.D. Mich. 2012); *Bank of Mongolia*, 258 F.R.D. at 520-521; *Simon Property Group. L.P. v. mySimon. Inc.*, 194 F.R.D. 639,642 (S.D. Ind. 2000). The written findings of the court-appointed expert are provided to the responding party, which may either produce those findings in their entirety to the requesting party, or assert objections to their production by submitting

an objection or privilege log to the trial court. *In re Honza*, 242 S.W.3d 578, 582 (Tex. App. 2008); *Bank of Mongolia*, *supra*: *Playboy Enterprises, Inc.*, 60 F. Supp. 2d at 1055. If objections are asserted, the expert's findings and the responding party's objections are submitted to the court for an in camera review and eventual resolution of the parties' discovery dispute. *In re Honza, supra*; *Antioch Co. v. Scrapbook Borders, Inc.*, 210 F.R.D. 645, 654 (D. Minn. 2002); *Playboy Enterprises, Inc.*, *supra*. *See also*, Richard H. Agins, "An argument for expanding the application of rule 53(B) to facilitate reference of the special master in electronic data discovery," 23 Pace L. Rev. 689,707-708 (Spring 2003).

Sandvik contends that it devised in-house applications of a refined N-value term and FEA to create "idealized straight line torque and stress information" which enable it "to manufacture custom-engineered springs based on the design specifications of its clients." "Upon information and belief" following its review of Mecca's website, Sandvik asserts that Mecca has misappropriated those trade secrets by assimilating them into his spring technology software. Mecca denies Sandvik's allegations and insists that his software is the product of his own ingenuity and publicly available N-value term and FEA concepts. Mecca further submits that the grant of Sandvik's discovery request will permit Sandvik to discover Mecca's own trade secrets and to utilize his applications to improve Sandvik's inferior software. *See Crum*, 907 A.2d at 584 (observing that the confidentiality of potential trade secrets "is irreparably lost" following their disclosure to a litigation adversary due to the absence of an "effective remedy for a breach of the existing protective order.").

The most equitable means to unravel the parties' Gordian knot is to appoint a spring technology software expert to review the parties' spring technology software in order to determine whether Mecca's software incorporates Sandvik's trade secrets and, therefore, is subject to discovery by Sandvik. The appointed expert will serve as an officer of the court and will be required to execute a confidentiality order, jointly prepared by counsel for Sandvik and Mecca, which bars the expert from divulging the parties' software and trade secrets except as prescribed by this memorandum and order. The court-appointed expert will prepare a written report containing the expert's findings with respect to the issue of whether Mecca's software improperly appropriates Sandvik's trade secrets. The expert's report will be provided to Mecca's counsel in the first instance, and Mecca may either provide that report to Sandvik's counsel or assert an objection to the discoverability of the expert's findings and Mecca's software. In the latter event, the expert's report will be submitted to the undersigned for an *in camera* review, and Mecca's objection(s) will be served upon opposing counsel so that Sandvik may respond to the same before the matter is submitted for a decision.

Trial courts possess the inherent authority to appoint special masters to assist in the resolution of discovery disputes. *See, e.g., Liss & Marion. P.C. v. Recordex Acquisition Corp.*, 937 A.2d 503, 515 (Pa. Super. 2007), *aff'd*, 603 Pa. 198, 983 A.2d 652 (2009). Sandvik's proffered objection to the appointment of a spring software expert for the limited purpose of discovery, as opposed to the global merits of the case, does not warrant a different course of action. The validity of Sandvik's trade

secrets claim and the discovery of Mecca's software are inextricably intertwined and present inseparable issues. Indeed, in Sandvik's brief in opposition, it acknowledges that Mecca's software which Sandvik seeks to discover "is not merely relevant to the subject matter of the action, it is the touchstone of the entire case; without it, Sandvik would be unable to pursue its claims against [Mecca]." (Docket entry no. 9 at p. 5). Under the protocol set forth above, Mecca's software must contain Sandvik's trade secrets in order to be discoverable by Sandvik. If Mecca's software does not integrate Sandvik's trade secrets, Mecca's software will not be subject to discovery and Sandvik will have no evidentiary basis for pursuing its claims against Mecca. *See* Pa.R.C.P. 1023.1(c). Thus, the most sensible solution to the parties' discovery impasse is to appoint an appropriate expert to determine whether Mecca's software merely embodies publicly available information and Mecca's own sagacity or, as Sandvik contends, misappropriates Sandvik's trade secrets and proprietary applications. An appropriate order follows.

## ORDER

And now, this 21st day of May, 2014, upon consideration of the "appeal motion of defendants, Mecca C & S, Inc. and William Mecca" relative to the discovery order of the special trial master, the exhibits and memoranda of law submitted by the parties, and the oral argument of counsel, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

1. Within the next ten (10) days, counsel for the parties shall agree upon the designation of a spring technology software expert to access and analyze the parties' respective

spring technology software in order to determine whether defendants' spring software incorporates plaintiff's trade secrets and proprietary information, as alleged in the complaint. If the parties are unable to mutually agree upon the selection of such an expert, they shall submit to the undersigned, by no later than June 4, 2014, the names, biographies and contact information for three (3) individuals to be considered for court-appointment as the spring technology software expert;

2. The court-appointed spring technology software specialist will serve as an officer of the court and shall sign a confidentiality order, jointly prepared by counsel for the parties, barring that individual from disclosing any spring software information to any person or party, other than as prescribed by this memorandum and order. Any direct or indirect access that the court-appointed expert gains to the parties' respective software shall not be deemed to be a waiver of any objection or privilege that either party may have to such software or information;

3. Within ten (10) days of the court-appointment of the spring technology software expert, plaintiff, Sandvik, Inc., shall provide such expert access to its spring technology software, including, but not limited to, any applications of a refined N-value term and finite element analysis which plaintiff contends constitute its trade secrets and proprietary information;

4. Within ten (10) days of the date that the court-appointed spring technology software specialist completes the expert's review and evaluation of plaintiff's spring technology software, defendants, Mecca C & S, Inc. and William Mecca, shall provide that expert access

to defendants' spring technology software in order to determine whether it contains plaintiff's trade secrets and proprietary information, as alleged in the complaint;

5. Within thirty (30) days of the completion of the court-appointed spring technology software specialist's review and analysis of defendants' spring technology software, the court-appointed expert shall forward a written report to defendants' counsel containing the expert's findings and conclusions with respect to the review of the parties' spring technology software. Within seven (7) days of defense counsel's receipt of the written report of the court-appointed spring technology software expert, defendants shall either (a) provide the expert's report to counsel for plaintiff, or (b) file written objections to the production of that report and serve copies of those objections upon the undersigned and opposing counsel. In the event that defendants object to the production of the expert's report, it shall submit a copy of that report to the undersigned for an in camera review, and plaintiff shall file a written response to defendants' objections within seven (7) days of the filing of those objections by defendants; and

6. The fees charged by the court-appointed spring technology software specialist shall be shared and borne equally by the parties, and the parties shall pay their respective shares of the expert's bill within thirty (30) days of receipt of the same.