# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kendra Smith on behalf of      :
Smith Butz, LLC,      :
          Petitioner      :
     :
          v.      : No. 1431 C.D. 2016
     : Argued: April 6, 2017
Pennsylvania Department of      :
Environmental Protection,      :
          Respondent      :


BEFORE:   HONORABLE ROBERT SIMPSON, Judge
          HONORABLE JULIA K. HEARTHWAY, Judge
          HONORABLE DAN PELLEGRINI, Senior Judge


OPINION BY
SENIOR JUDGE PELLEGRINI           FILED: May 8, 2017


Kendra Smith, on behalf of Smith Butz, LLC (Requester), petitions for review of a Final Determination of the Office of Open Records (OOR) denying in part her request to the Pennsylvania Department of Environmental Protection (DEP) for access to records relating to Core Laboratories d/b/a ProTechnics, division of Core Laboratories, LP (ProTechnics), under the Pennsylvania Right-to-Know Law (RTKL).[1]

---

[1] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101–67.3104.

**I.**

On February 1, 2016, Requester submitted a RTKL request, later amended,[2] for all records held by the DEP relating to ProTechnics, a business that performs drilling diagnostics using radioactive tracers. The request sought records related to ProTechnics' activities at all drill sites throughout the Commonwealth, including:

> [Item 1] Any and all approvals, permits, licenses/licensures, applications for permits and/or licenses, reciprocity letters, reciprocity licenses, reciprocity agreements and/or reciprocity arrangements, including, but not limited to all licenses issued by the [DEP to Protechnics] for use, storage and possession of radioactive materials and/or other licensed material. Additionally, this request seeks any and all investigation reports, Notices of Violation(s), Consent Order and Agreement(s) issued to Protechnics by the PA DEP and/or between Protechnics and the PA DEP for any and all work or services performed by Protechnics at any natural gas well site in the Commonwealth of Pennsylvania. Included in this request is a request for copies of all Notices of Violation issued by the PA DEP to Protechnics, including but not limited to Notices of Violation dated 06/15/10, 1/28/10, 11/26/13, 09/13/13 and 10/14/13, Violation Numbers 677913, 677915, 677914, 682834, 682833, 682829, 682835 and all corresponding inspection reports, field notes and other related writings. Further, this request seeks any and all Consent Order and Agreements between the PA DEP and Protechnics, including, but not limited to, Consent Orders and Agreements dated November 2, 2013 and November 2, 2010.

---

[2] While the original RTKL request sought only records relating to the Yeager Drill Site, on February 3, 2016, the RTKL request was modified to include all Commonwealth drill sites.

[Item 2] Additionally, this request includes a request for copies of all enforcement activity taken by the PA DEP against Protechnics, including but not limited to Enforcement ID Number 305057, 259202 and 263973, as well as all inspection reports completed by the PA DEP regarding Protechnics, including, but not limited to, Inspection ID Numbers 1891418, 1919964, 2147772, 2204156 and 2221258.

[Item 3] This request further seeks any and all Radioactive Tracer Well Site Agreements made between Protechnics and any well site operator(s) for each and every well traced in the Commonwealth of Pennsylvania that is or was submitted to the PA DEP, including, but not limited to, the April 7, 2013, Radioactive Tracer Well Site Agreement between Protechnics and a well operator.

[Item 4] In addition to the above, this request seeks any and all notifications submitted to the PA DEP by Protechnics or the associated operator or subcontractor regarding Protechnics['] confirmation that licensed material, including, but not limited to, radioactive material, was returned to the surface at any well site in which Protechnics operated/performed work or services in the Commonwealth of Pennsylvania.

[Item 5] Additionally, this request seeks any and all documents, correspondence, e-mails and any other communication(s) between Protechnics and the PA DEP and/or Range Resources and the PA DEP regarding Protechnics and any and all work/services performed in the Commonwealth of Pennsylvania by Protechnics.

[Item 6] Further, this request seeks any and all MSDS/SDS (material data safety sheets and safety data sheets) in the possession of the PA DEP regarding any and all products utilized by Protechnics at any well site in Pennsylvania, including, but not limited to, all MSDS/SDS for Protechnics Radioactive Tracer Products, as well as any and all Chemical Frac Tracer ("CFT") products, including, but not limited to, CFT 1000, CFT 1100, CFT 1200, CFT 1300, CFT 2000, CFT 2100, CFT 1900, CFT 1700.

3

(Reproduced Record (R.R.) at 3a-4a.)

Because the request was statewide in scope, the DEP tasked its Central Office as well as its Southeast, Northeast, Southcentral, Northcentral, Southwest and Northwest Regional offices to gather those documents that responded to the request. On February 8, 2016, the DEP invoked a 30-day extension. *See* Section 902(b) of the RTKL, 65 P.S. § 67.902(b). On March 9, 2016,[3] the DEP partially denied the RTKL request.

On March 28, 2016, Requester appealed to the OOR, challenging the DEP's denial and giving reasons why the records should be released. The OOR then directed the DEP to notify any third parties that may be affected by the release of the documents of their right to participate in the appeal. *See* Section 1101(c) of the RTKL, 65 P.S. § 67.1101(c). Soon thereafter, ProTechnics requested to participate in this appeal, and the OOR granted the request. The OOR then invited all parties to supplement the record.

---

[3] The Southwest Regional Office allegedly "completed its letter and placed it in the office's mail system on March 9, 2015, [but] the letter was not postmarked until March 10, 2015. All offices but the Northeast Regional Office granted in part and denied in part [the RTKL] request. The Northeast Regional Office possessed no records." (DEP's Brief at 6.) Because it is undisputed that the Southwest Regional Office's reply was postmarked after the response deadline, this was deemed a denial. *See* Section 901 of the RTKL, 65 P.S. § 67.901. The Northeast Regional Office provided the affidavit of Colleen B. Stutzman, Assistant Regional Director, attesting that the Northeast Regional Office does not have any of the requested records in its custody, control or possession. (R.R. at 1633a-1634a.) "[A]n agency may satisfy its burden of proof that it does not possess a requested record with either an unsworn attestation by the person who searched for the record or a sworn affidavit of nonexistence of the record." *Hodges v. Department of Health*, 29 A.3d 1190, 1192 (Pa. Cmwlth. 2011).

4

The DEP then submitted a position statement along with ten affidavits[4] and privilege logs.[5] The DEP's position statement contended that it was partially denying the RTKL request because the records were exempt under the Radiation Protection Act (RPA)[6] exception, the attorney-client privilege and/or the attorney work product doctrine,[7] as well as certain RTKL exceptions.[8]

---

[4] The DEP provided the sworn affidavits of: Dawn Schaef, DEP's Open Records Officer; David Allard, Director of DEP's Bureau of Radiation Protection Program; Lisa Forney, Radiation Protection Supervisor of the Radioactive Materials and Special Projects Section of the DEP's Southcentral Regional Office; Terry Derstine, Environmental Program Manager of the Radiation Protection Program in the DEP's Southeast Regional Office; Colleen Stutzman, Assistant Regional Director of the DEP's Northeast Regional Office; Patrick Brennan, Environmental Program Manager of the Waste Management Program in the DEP's Northcentral Regional Office; Jennifer Means, Program Manager of the Oil and Gas Management Program in the DEP's Northcentral Regional Office; Barbara Bookser, Section Chief of the Bureau of Radiation Protection for the DEP's Southwest and Northwest Regions; Dwight Shearer, Program Manager of the Bureau of Radiation Protection for the DEP's Southwest and Northwest Regions; and Staci Gustafson, Assistant Regional Director of the DEP's Northwest Regional Office.

[5] "Testimonial affidavits found to be relevant and credible may provide sufficient evidence in support of a claimed exemption." *Heavens v. Department of Environmental Protection*, 65 A.3d 1069, 1073 (Pa. Cmwlth. 2013). "In addition, a privilege log, which typically lists the date, record type, author, recipients, and a description of the withheld record, can serve as sufficient evidence to establish an exemption, especially where the information in the log is bolstered with averments in an affidavit." *McGowan v. Department of Environmental Protection*, 103 A.3d 374, 381 (Pa. Cmwlth. 2014).

[6] Act of July 10, 1984, P.L. 688, *as amended,* 35 P.S. §§ 7110.101-7110.703.

[7] As pertinent, the RTKL defines "privilege" as incorporating "[t]he attorney-work product doctrine" and "the attorney-client privilege." *See* Section 102 of the RTKL, 65 P.S. § 67.102.

[8] The DEP relied on Sections 708(b)(6), (10), (11), (12) and (17) of the RTKL, 65 P.S. §§ 67.708(b)(6), (10), (11), (12) and (17), which exclude from disclosure personal identification information, internal predecisional deliberations, trade secrets or confidential proprietary information, the notes and working papers of department employees/officials, and non-criminal investigations, respectively. The DEP also relied on Sections 708(b)(2) and (3) of the RTKL, 65
**(Footnote continued on next page…)**

ProTechnics submitted a position statement contending that certain records were exempt from disclosure because they contain trade secrets and/or confidential proprietary information.  *See* Section 708(b)(11) of the RTKL, 65 P.S. §67.708(b)(11).  In support thereof, ProTechnics attached the sworn affidavit of Will Williams, the Director of U.S. Operations for ProTechnics.

On July 27, 2016, after reviewing the submissions of the parties, the OOR issued its final determination partially denying Requester's appeal.  The net effect is that the DEP was not required to release "all of the identified records in its privilege logs except for a small subset of records regarding ProTechnics' license information and limited information regarding gas well pads."  (DEP's Brief at 8.)[9] Requester then filed this appeal in which she contends that the OOR erred in not releasing the requested records for a number of reasons.[10]

**(continued…)**

P.S. §§ 67.708(b)(2) and 67.708(b)(3), which exclude from disclosure records reasonably likely to threaten public safety or endanger the safety and physical security of a building, public utility, resource or infrastructure.

[9] After reviewing the privilege log submitted by the DEP and determining that it was identical to the privilege log for a different RTKL matter the DEP was involved in with a different requester, the OOR determined that the DEP was "collaterally estopped" from denying certain records and incorporated that opinion to effectively deny Requester the remainder of her RTKL request.  As a preliminary matter, Requester contends on appeal that the OOR violated her due process rights when resolving this matter by incorporating a previous decision. However, because this is a *de novo* appeal and Requester does not assert a particular harm deriving from the OOR's incorporation and reliance on its previous decision, which involved an identical privilege log and withheld records by the DEP, Requester does not assert and we do not find any material harm resulting from the OOR's conduct.

[10] This Court's standard of review is *de novo* and our scope of review is plenary. *Bowling v. Office of Open Records*, 75 A.3d 453, 477 (Pa. 2013).  Under the RTKL, information **(Footnote continued on next page…)**

6

## II.

Requester contends that under the DEP's RPA regulation, she is entitled to its investigation reports for three separate incidents regarding well sites[11] where ProTechnics used radioactive tracers.

The RTKL exempts from disclosure any records relating to an agency investigation. Under its regulations promulgated under the RPA,[12] the DEP exempts from disclosure only "[a] report of investigation, **not pertaining to safety and health in industrial plants,** which would disclose the institution, progress or results of an investigation undertaken by the Department." 25 Pa. Code § 215.14

_____

**(continued…)**

is only subject to disclosure if it is a "public record." Section 301(a) of the RTKL, 65 P.S. § 67.301(a). Pursuant to Section 305 of the RTKL, 65 P.S. § 67.305, a record in the possession of a Commonwealth agency shall be presumed to be a public record unless: (1) it is exempt under Section 708 of the RTKL; (2) the record is protected by a privilege; or (3) the record is exempt from disclosure under any other federal or state law or regulation or judicial order. *McGowan*, 103 A.3d at 380. The agency receiving a RTKL request bears the burden of proving that the record is exempt by a preponderance of the evidence. Section 708(a) of the RTKL, 65 P.S. § 67.708(a). The preponderance of the evidence standard, which is "the lowest evidentiary standard, is tantamount to a more likely than not inquiry." *Delaware County v. Schaefer ex rel. Philadelphia Inquirer*, 45 A.3d 1149, 1154 (Pa. Cmwlth. 2012).

[11] The DEP's regulation defines "well site" as an "area occupied by the equipment of facilities necessary for or incidental to the drilling, production or plugging of a well." 25 Pa. Code § 78.1.

[12] The DEP is designated "as the agency of the Commonwealth for the purpose of registration, licensing, regulation and control of radiation, radiologic procedures, radiation sources and users of radiation sources." Section 301(a) of the RPA, 35 P.S. § 7110.301(a). As pertinent, the RPA provides the DEP with the power and duty to conduct studies and investigations relating to the control, regulation and monitoring of radiation sources, and to collect and disseminate information related to the control of radiation sources and the effects of radiation exposure. 35 P.S. § 7110.301(c)(12)-(13).

7

(emphasis added).[13]  Requestor contends that since the regulation does not exempt from disclosure any records of investigation "pertaining to safety and health in industrial plants," those records should be disclosed.  The DEP contends that the records need not be released because a "well site" is not an "industrial plant."

The term "industrial plant" or its component words are not defined in the RPA or its regulations.  When terms in a statute are not defined, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage. . . ."  *See* 1 Pa.C.S. § 1903(a).[14]  Because both parties agree that what takes place on a well pad is industrial in nature, the question is does a "well site" fall within the definition of "plant."

Webster's Ninth New Collegiate Dictionary 899 (1989) defines "plant" as:

> a. the **land**, buildings, **machinery**, **apparatus**, and **fixtures** employed in carrying on a trade or an industrial business;
>
> b. a factory or workshop for the manufacture of a particular product;
>
> c. **the total facilities** available for production or service; or

---

[13] While the RPA regulations also protect "[t]rade secrets or secret industrial processes customarily held in confidence," 25 Pa. Code § 215.14(1), neither the DEP nor ProTechnics assert an exemption under this provision.

[14] This rule applies equally when interpreting administrative regulations.  *See Bayada Nurses, Inc. v. Department of Labor & Industry*, 958 A.2d 1050 (Pa. Cmwlth. 2008).

8

d. the buildings **and other physical equipment** of an institution.

*Id.* (Emphases added.)

The DEP contends that a well site is not a "plant" within that definition as a well site is not a "factory or workshop" because to fall within those terms the activity must take place in a building. Because a well site is not enclosed in a building, it contends that a well site is not a plant. The DEP also contends that its interpretation of what is a "plant" should be given deference because it is charged with enforcing the regulation at issue.

For its part, Requester contends that a well site is a "plant" because all the drilling apparatus, holding tanks and other machinery that produce natural gas fall within the definition of "plant" as that term is commonly understood to mean "the land, buildings, machinery, apparatus, and fixtures employed in carrying on a trade or an industrial business." *Id.*

In deciding what is meant by the term "industrial plant," initially, we point out that while we agree with the DEP that, normally, deference is given to an agency's interpretation of its own ambiguous regulation, giving deference here is "undoubtedly inappropriate . . . when it appears that the interpretation is nothing more than a 'convenient litigation position.'" *Christopher v. SmithKline Beecham Corporation*, 567 U.S. 142 (2012) (quoting *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 213 (1988) (no deference given to an interpretation of a regulation contained in a court brief)).

9

The only statute we have been able to find that defines this term is the Energy Policy and Conservation Act which defines "industrial plant" as "any fixed equipment or facility which is used in connection with, or as part of, any process or system for industrial production or output." 42 U.S.C. § 6326(5). We adopt that definition because it is in accord with the dictionary definitions listed above as well as common understanding of the word that does not require the facility to be enclosed in a building – *e.g.*, concrete and asphalt plants. Accordingly, under the RPA regulations, investigative reports pertaining to well sites are public records unless the report contains trade secrets and/or confidential proprietary information which can be redacted.

## III.

Requester next contends that the DEP failed to demonstrate certain records are protected by the attorney-client privilege and/or work-product doctrine.

Section 102 of the RTKL defines "privilege" as "[t]he attorney work-product doctrine, the attorney-client privilege, the doctor-patient privilege, the speech and debate privilege or other privilege recognized by a court incorporating the laws of this Commonwealth." 65 P.S. § 67.102. The burden of proving a privilege rests on the party asserting it. *Heavens*, 65 A.3d at 1074.

To establish the attorney-client privilege, the agency asserting it must demonstrate that: (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made is a member of the bar of a court or his subordinate; (3) the communication relates to a fact of which

10

the attorney was informed by his client, without the presence of strangers, for the purpose of securing either an opinion of law, legal services or assistance in a legal matter and not for the purpose of committing a crime or tort; and (4) the privilege has been claimed and is not waived by the client. *Bagwell v. Department of Education*, 103 A.3d 409, 420 n.12 (Pa. Cmwlth. 2014).

> The work-product doctrine, while closely related to the attorney-client privilege, provides broader protection. *Levy* [*v. Senate of Pennsylvania*, 94 A.3d 436 (Pa. Cmwlth. 2014)]; *Dages v. Carbon County*, 44 A.3d 89 (Pa. Cmwlth. 2012). Confidential information flows from the client to the attorney, and vice versa, in the attorney-client relationship. *Gillard v. AIG Insurance Co.*, 15 A.3d 44 (Pa. 2011). The attorney-client privilege protects such confidential communications. *Id.* By contrast, the work-product privilege only applies to "the mental impressions, theories, notes, strategies, research and the like created by an attorney in the course of his or her professional duties. . . ." *Pennsylvania Public Utility Commission v. Seder*, 106 A.3d 193, 201 (Pa. Cmwlth. 2014) (emphasis added) (citing *Levy*). Neither privilege protects mere facts. *Commonwealth v. Vartan*, 733 A.2d 1258 (Pa. 1999); *Upjohn Co. v. United States*, 449 U.S. 383 (1981).

*Pennsylvania Department of Education v. Bagwell*, 114 A.3d 1113, 1123–24 (Pa. Cmwlth. 2015).

In support of its assertion that certain records are protected as privileged, the DEP supplies several affidavits[15] attesting that certain specified

---

[15] The affidavits of David Allard, Director of DEP's Bureau of Radiation Protection Program, Lisa Forney, Radiation Protection Supervisor of the Radioactive Materials and Special **(Footnote continued on next page…)**

records sought legal advice regarding: the DEP's noncriminal investigations of ProTechnics; preparation for meetings with ProTechnics; enforcement actions against ProTechnics; and ProTechnics' applications, agreements and reporting obligations. Each affidavit specifies the DEP attorneys consulted and that they are admitted to the Pennsylvania Bar. Each affidavit also attests that these records contain the mental impressions, conclusions, opinions and written work-product created by the DEP counsel regarding the issues for which legal advice was sought. "At no time were the communications of DEP legal counsel made in the presence of a third party." (R.R. at 1959a.)

Accordingly, because Requester has not provided evidence demonstrating waiver of privilege,[16] the OOR correctly determined that the DEP met its burden of proving that these records are protected by the attorney-client privilege and/or the attorney-work product doctrine.

---

**(continued…)**

Projects Section of the DEP's Southcentral Regional Office, and Terry Derstine, Environmental Program Manager of the Radiation Protection Program in the DEP's Southeast Regional Office. The DEP also provided privilege logs for its various offices asserting, *inter alia*, that certain specified records were exempt from disclosure under the RTKL because they were privileged.

[16] *See Bagwell*, 103 A.3d at 420. ("[W]hen waiver is the focus of a dispute, the burden is shifted to the party asserting waiver.").

**IV.**

Requester next contends the DEP failed to demonstrate that disclosure of responsive records reflecting the current location and quantity of radioactive material will likely jeopardize public safety and security.[17]

Section 708(b)(2) of the RTKL exempts from disclosure records "maintained by an agency in connection with . . . law enforcement or other public safety activity that if disclosed would be reasonably likely to jeopardize or threaten public safety  . . . or public protection activity. . . ."  65 P.S. § 67.708(b)(2).  To establish this exemption, an agency must show:  (1) the record at issue relates to law enforcement or public safety activity; and (2) disclosure of the record would be reasonably likely to threaten public safety or a public protection activity.  *Carey v. Department of Corrections*, 61 A.3d 367, 374-75 (Pa. Cmwlth. 2013).

Section 708(b)(3) of the RTKL also exempts from disclosure "[a] record, the disclosure of which creates a reasonable likelihood of endangering the safety or the physical security of a building, public utility, infrastructure, facility or information storage system."  65 P.S. §67.708(b)(3).  For this exemption to apply, "the disclosure of" the records, rather than the records themselves, must create a reasonable likelihood of endangerment to the safety or physical security of certain

---

[17] Because Requester only appeals from the OOR's determination, we do not decide whether the OOR correctly granted Requester records disclosing the location of gas well sites, the contact information of well site owners/operators, and contact information and licensing records relating to ProTechnics, including internal tracking numbers.

13

structures or other entities, including infrastructures. "Reasonably likely" has been interpreted as "requiring more than speculation." *Carey*, 61 A.3d at 375.

In its position statement and again in its brief on appeal, the DEP asserts a multitude of security and safety reasons for why radioactive materials files, which contain information regarding the current location and quantity of radioactive materials possessed by licensees, should not be released to the public. As pertinent, Director Allard attests that other states and regulatory agencies have already dealt with fictitious entities and individuals fraudulently obtaining radioactive materials. According to a 2014 report by the United States Government Accountability Office (GAO), since 1993, there have been 615 confirmed incidents involving theft or loss of nuclear and radioactive materials worldwide.[18]

> The conclusion of the GAO's 2014 report . . . warns that "[i]n the hand of terrorists, these sources could be used to produce a simple and crude, but potentially dangerous weapon, known as a radiological dispersal device or dirty bomb, whereby conventional explosives are used to disperse radioactive material."

(R.R. at 1941a.)

---

[18] The DEP also attached a 2016 GAO Report to its brief that is not part of the certified record. In a RTKL appeal involving a Commonwealth agency, this Court has the discretion to rely upon the record created below or to create its own. *Department of Labor & Industry v. Heltzel*, 90 A.3d 823 (Pa. Cmwlth. 2014) (*en banc*). Here, we have relied on the record created by the OOR because we are serving in our appellate capacity.

Due to these experienced and real-world risks associated with disclosure of information relating to radioactive materials, the DEP determined:

> DEP's radioactive materials files also contain information regarding the current location and quantity of radioactive materials possessed by licensees. Making this information available to the public presents a risk "reasonably likely to jeopardize or threaten public safety or preparedness or public protection activity."
>
> Location and quantity information, should it be publicly available, could be used by terrorists or other criminals who want to obtain radioactive materials or could create an increased threat to the licensee housing the materials thus making it a target of criminal activity. An increased threat would exist of exposing other persons to radioactive materials, and the associated health risks, after the materials were taken from the licensee.

(R.R. at 1946a.)[19]

Accordingly, the DEP clearly met its burden of proving that the disclosure of certain records reflecting the current location and quantity of radioactive materials possessed by ProTechnics is reasonably likely to jeopardize public security and/or safety.

---

[19] Notwithstanding this determination, "DEP granted [Requester's] RTKL request with respect to NOVs, Consent Order and Agreements, and Addendum, but redacted information that could compromise public health, safety, and security. . . ." (R.R. at 1950a.)

## V.

Requester contends that ProTechnics[20] failed to demonstrate that its Race and Logging Services Field Receipt Agreements (FRAs), certain correspondence with the State of California relating to tracer materials (California Correspondence), and raw data and methodology are exempt from disclosure because each would reveal trade secrets and/or confidential proprietary information.[21]

Section 708(b)(11) of the RTKL specifically exempts from disclosure "[a] record that constitutes or reveals a trade secret or confidential proprietary information." 65 P.S. § 67.708(b)(11). Trade secrets are defined in the RTKL as:

> Information including a formula, drawing, pattern, compilation, including a customer list, program, device, method, technique or process that:
>
> (1) derives economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; [and]
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

---

[20] Because ProTechnics is a party in this appeal and has filed a brief in this matter, the DEP did not brief this particular issue.

[21] Because Requester only appeals from the OOR's determination, we will not evaluate the OOR's partial grant of Requester's RTKL with respect to this exemption.

Section 102 of the RTKL, 65 P.S. § 67.102. This definition is identical to that contained in the Uniform Trade Secrets Act. *See* 12 Pa.C.S. §§ 5302, 5308.

Certain information constitutes a "trade secret" based upon the following factors: (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by employees and others in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and to competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Commonwealth v. Eiseman*, 85 A.3d 1117, 1126 (Pa. Cmwlth. 2014), *rev'd on other grounds*, 125 A.3d 19 (Pa. 2015) (citing *Crum v. Bridgestone/Firestone North American Tire*, 907 A.2d 578 (Pa. Super. 2006)). A "trade secret" must be an "actual secret of peculiar importance to the business and constitute competitive value to the owner." *Parsons v. Pennsylvania Higher Education Assistance Agency*, 910 A.2d 177, 185 (Pa. Cmwlth. 2006). "The most critical criteria are 'substantial secrecy and competitive value.'" *Eiseman*, 85 A.3d at 1126 (quoting *Crum*, 907 A.2d at 585.)

"Confidential proprietary information" is defined as "[c]ommercial or financial information received by an agency: (1) which is privileged or confidential; and (2) the disclosure of which would cause substantial harm to the competitive position of the person that submitted the information." *Giurintano v. Department of General Services*, 20 A.3d 613, 615-16 (Pa. Cmwlth. 2011) (citing Section 102 of the RTKL, 65 P.S. § 67.102).

In determining whether certain information is "confidential," the OOR must consider "the efforts the parties undertook to maintain their [sic] secrecy." *Eiseman*, 85 A.3d at 1128. "In determining whether disclosure of confidential information will cause 'substantial harm to the competitive position' of the person from whom the information was obtained, an entity needs to show: (1) actual competition in the relevant market; and, (2) a likelihood of substantial injury if the information were released." *Id.* "Competitive harm analysis 'is limited to harm flowing from the affirmative use of proprietary information by competitors. . . .'" *Id.* (citing *Watkins v. United States Bureau of Customs*, 643 F.3d 1189, 1194 (9th Cir. 2011)).

By way of background, ProTechnics provides state-of-the-art radioactive tracing services to the energy industry in more than 30 countries and has "patented Zero Wash® materials which are radioactive particles encapsulated in a ceramic bead that allow ProTechnics to pinpoint specific stages or segments and different proppant or fluid types in hydraulic fracture and other completion operations." (R.R. at 1521a.) The DEP regulates ProTechnics' "licensure conditions and the authorized use of byproduct radioactive material in tracer studies in oil, gas, and geothermal wells," and "[p]art of [its] obligations as a regulated entity is to submit to the DEP various documentation related to its business activities." (R.R. at 1522a.)

ProTechnics contends that disclosure of its FRAs is exempt under the RTKL as trade secrets and/or confidential proprietary information because they

provide a detailed description of the exact type and amount of tracer used in trace and logging services, which is "unique and client specific." (R.R. at 1523a.)

> If this information were shared publicly, competitors would gain access to information regarding ProTechnics' completion designs, its clients' well dynamics, and production estimates. . . . [F]rom this information, competitors could gain insight into ProTechnics' clients' preferences regarding completion designs, well dynamics and production information and then use that information to tailor their pitches to ProTechnics' clients accordingly.
>
> Furthermore, the [FRAs] also reflect ProTechnics' confidential pricing information for its trace and logging services. . . . [T]he disclosure of client confidentiality would result in substantial competitive harm to [ProTechnics] . . .
>
> Indeed, ProTechnics goes to great lengths to protect its confidential propriety information . . . Such information is only shared with third parties when legally obligated, in confidence and with those who ProTechnics provides services. ProTechnics has multiple service agreements and/or contracts that specify confidentiality terms between ProTechnics and its clients. All recipients of this sensitive information receive notification that it is confidential proprietary information. This information within ProTechnics is accessible to only a limited number of individuals and on a "need-to-know" basis. ProTechnics has taken specific steps to protect the confidentiality of this information, including the implementation of strict work practice requirements to ensure that the necessary internal company controls are in place to ensure the limited use of confidential information. Confidential information is maintained in a company password-protected system. Employees of ProTechnics that have access to such information have, in addition to their common law obligations, undertaken a written obligation to maintain the confidentiality and secrecy of that information.

19

(R.R. at 1523a, 1525a) (enumerations omitted).

Regarding the California Correspondence, ProTechnics Director Williams attests that it contains confidential customer information including the location of ProTechnics' customer facility, the materials stored there, and "sensitive information regarding low-level radioactive materials including a description of the exact type of low-level radioactive material at issue, the amount of activity and low-level radiation levels of those materials." (R.R. at 1524a.) Williams attests this Correspondence includes non-public "information about client names, specific projects and pricing for ProTechnics' work. . . ." *Id.*

Regarding ProTechnics' raw data and/or methodology, Williams attests that this information is proprietary and confidential because it "would enable ProTechnics' competitors to copy ProTechnics' valuable and proprietary business methods and, if ProTechnics' competitors or customers gained access . . . it would severely harm ProTechnics' business by posing significant competitive and financial detriment to ProTechnics." (R.R. at 1524a-1525a.) Williams further attests that ProTechnics treats this information as confidential and proprietary and implements numerous safeguards so as to protect the information at issue.

Notwithstanding the Williams' affidavit, Requester contends that "this information is already available in the public domain and, as such, is not privileged or confidential." (Requester's Brief at 49.) As she contends, "Not only was this information disclosed in open court by the President of ProTechnics, it is also available on the United States Patent and Trademark Office's website and in a

research article published . . . entitled 'Study and application of Zero Wash tracer fracture monitoring.'" *Id.*

While ProTechnics' patent discloses the general contents of Zero Wash, it only discusses the amounts of each particular substance and/or ingredient in terms of "ranges." (*See* R.R. at 202a.) The same can be said regarding its president's testimony, who repeatedly only provided testimony "without revealing any confidential or proprietary trade secret information. . . ." (*See* R.R. at 480a.) As for the Chinese research article provided by Requester, which does not seem to be sponsored or published by ProTechnics, this study does not even seem to specify all of the contents of Zero Wash, which is alleged to be "unique and client specific." (R.R. at 1523a.)

In any event, Williams' statements establish that ProTechnics keeps its raw data and methodology and the information contained in the Correspondence and FRAs confidential, and that disclosing these identified records and the information contained therein would cause substantial harm to its competitive position.

Accordingly, accepting Williams' statements, we conclude the OOR correctly determined that these records constitute confidential proprietary information and/or trade secrets. *See Giurintano*, 20 A.3d at 616-17 (affidavit of president and CEO of third-party contractor sufficient to establish that the requested information constituted confidential proprietary information).

21

## VI.

Requester contends that the DEP failed to demonstrate that certain records constitute notes and working papers because certain descriptions contained in the DEP's privilege logs "clearly relate to a person's official position and action." (Requester's Brief at 53.)

Section 708(b)(12) of the RTKL exempts from disclosure "[n]otes and working papers prepared by or for a public official or agency employee used solely for that official's or employee's own personal use, including telephone message slips, routing slips and other materials that do not have an official purpose." 65 P.S. § 67.708(b)(12). "'Personal' within this definition does not mean that it has to involve a public official's personal affairs—a message slip that his wife called—because those types of documents are not covered by the RTKL, *Easton Area School District v. Baxter*, 35 A.3d 1259 (Pa. Cmwlth. 2012); it covers those documents necessary for that official that are 'personal' to that official in carrying out his public responsibilities." *City of Philadelphia v. Philadelphia Inquirer*, 52 A.3d 456, 461 (Pa. Cmwlth. 2012).

As the above language demonstrates, a record will only fall within the "notes and working papers" exemption when it relates to an official's public responsibilities but is personal. In any event, the DEP provides the affidavit of Lisa A. Forney, Radiation Protection Supervisor of the Radioactive Materials and Special Projects Section of DEP's Southcentral Regional Office, who attests:

> Approximately 42 Records also contain the personal notes prepared by DEP staff and are used solely for that employee's own personal use.

22

The handwritten records were personal notes of Steven Acker, Radiation Protection Program Manager and myself. Each set of notes remained in the takers sole and exclusive possession and used to refresh recollections. The notes were not shared with others but created for the takers own personal use. The subject of these notes was the pending enforcement about the flowback/loss of control incident involving ProTechnics that was the subject of a DEP investigation. The notes were not taken at the direction of anyone at DEP and were created in the sole discretion of each employee.

(R.R. at 1738a.)

Accordingly, the DEP demonstrated that certain records fell within the notes and working papers exemption.

## VII.

Requester contends the DEP failed to demonstrate that certain responsive records reflect internal, pre-decisional deliberations.[22] As pertinent, Section 708(b)(10)(i)(A) of the RTKL exempts from disclosure a record that reflects:

_____

[22] The OOR determined that the DEP met its burden of proof with respect to certain records withheld under Section 708(b)(10) of the RTKL. "However, to the extent the records were sent to or received by individuals other than [DEP] employees/officials, such as representatives of ProTechnics, the records are not internal to [DEP] and cannot be withheld under Section 708(b)(10)." Because the DEP has not appealed the OOR's determination, we only address whether the OOR correctly determined that certain records fell within this exemption.

> The internal, predecisional deliberations of an agency, its members, employees or officials or predecisional deliberations between agency members, employees or officials and members, employees or officials of another agency, including predecisional deliberations relating to a budget recommendation, legislative proposal, legislative amendment, contemplated or proposed policy or course of action or any research, memos or other documents used in the predecisional deliberations.

65 P.S. § 67.708(b)(10)(i)(A).

To prove the predecisional deliberation exception, an agency must demonstrate that "(1) the information is internal to the agency; (2) the information is deliberative in character; and, (3) the information is prior to a related decision, and thus 'predecisional.'" *Carey*, 61 A.3d at 379. Records satisfy the "internal" element when they are maintained internal to one agency or among governmental agencies. *Id.* at 378; *see also Kaplin v. Lower Merion Township*, 19 A.3d 1209, 1216 (Pa. Cmwlth. 2011). To demonstrate that a record is deliberative in character, an agency must "submit evidence of specific facts showing how the information relates to deliberation of a particular decision." *Carey*, 61 A.3d at 379. "Only . . . confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice [are] protected as 'deliberative.'" *Id.* at 378. Factual information is not deliberative in character. *See McGowan*, 103 A.3d at 387-88.

In support of its nondisclosure of certain records, the DEP supplies numerous affidavits that specify the individual involved by name and title as well as the issues deliberated among DEP personnel. As attested to by Director Allard and other affiants:

24

> Records considered as being or reflect DEP's deliberations were emails, discussing proposed enforcement actions that DEP contemplated taking against ProTechnics, draft notification letters, draft NOVs, draft Consent Order and Agreements, draft Addendum, internal DEP emails, meeting notes pertaining to the NOVs issued by DEP to ProTechnics . . . ProTechnics' radioactive materials license application . . . radioactive materials license amendments, and an informal request for records submitted to DEP's Communication Office in October 2015.

(R.R. at 1957a.) Director Allard and other affiants also attest that the "[w]ithheld records for the RTKL exception did not include ProTechnics or any other third-party . . . contain no final decisions of DEP . . . [and] were not created after the final decisions to which they correlate. . . . The records do not contain purely factual information." (R.R. at 1956a, 1957a.)

A review of the affidavits supplied by the DEP and its privilege logs demonstrate that the records withheld by the DEP for purposes of this appeal consist of internal communications between DEP employees and officials and are predecisional because they occurred prior to a final decision. Moreover, the records are deliberative in nature as they relate to the course of action taken by the DEP when investigating ProTechnics and considering other actions.

Accordingly, the DEP met its burden in demonstrating that certain records reflect internal, predecisional deliberations.

## VIII.

Finally, Requester contends that the DEP failed to demonstrate that responsive records relate to noncriminal investigations of ProTechnics.

As pertinent, Section 708(b)(17) of the RTKL exempts from disclosure "record[s] of an agency relating to a noncriminal investigation," including "[i]nvestigative materials, notes, correspondence and reports[,]" and records that, if disclosed, would "[r]eveal the institution, progress or result of an agency investigation." 65 P.S. §§ 67.708(b)(17)(ii), (iv). In order for this exemption to apply, an agency must demonstrate that "'a systematic or searching inquiry, a detailed examination of official probe was conducted regarding a noncriminal matter." *Johnson v. Pennsylvania Convention Center Authority*, 49 A.3d 920, 925 (Pa. Cmwlth. 2012) (quoting *Department of Health v. Office of Open Records*, 4 A.3d 803 (Pa. Cmwlth. 2010)). The agency examination or probe must be "conducted as part of an agency's official duties," *Department of Health*, 4 A.3d at 814, and must specifically involve an agency's legislatively granted fact-finding powers. *Department of Public Welfare v. Chawaga*, 91 A.3d 257, 259 (Pa. Cmwlth. 2014).

Pursuant to the RPA and its regulations, the DEP has the authority to conduct inspections and investigations related to the control, regulation and monitoring of radiation sources. *See* Section 310(c)(2) of the RPA, 35 P.S. § 7110.310(c)(2); *see also* 25 Pa. Code § 215.12 (emphasis added). Director Allard attests that when the DEP conducts a noncriminal investigation pursuant to its

26

authority under the RPA and its regulations, it routinely performs the following general steps:

> Upon receiving notification from a waste disposal facility of non-acceptable radioactive material, the Radiation Protection Program will request information from the facility about the load of waste, including but not limited to, the type of waste and volume; the isotope identified; the activity of the isotope; the generator of the waste; the identity of the person(s) who performed a radiation survey; the type of equipment used to survey the waste; the current location of the waste; and a determination from the facility of its plans for the waste. . . .
>
> The Regional Radiation Protection Program will contact the waste generator director and/or assign a radiation health physicist to investigate the flowback/loss of control incident at the well site, seek to identify all parties involved, and investigate how the loss of control of licensed material occurred. Whenever possible, the radiation health physicist will document site conditions in a formal inspection report and obtain photographs of the well site.
>
> Once completed, all documentation is submitted to the Regional Radiation Protection Management Staff for review and approval of the inspection findings. Depending upon the severity of the violation, Regional Radiation Protection Management Staff will disclose inspection findings in accordance with its established compliance and enforcement guidance documents. If additional information is needed prior to disclosing inspection findings, DEP will schedule a conference.

(R.R. at 1934a.)

27

Following these general steps, the DEP has investigated ProTechnics for three separate incidents. Each investigation resulted after a landfill alerted the DEP that shipments of residual waste had triggered the landfill's radiation alarm and then the DEP tracked each of these shipments back to a well pad engaged by ProTechnics. Director Williams attests that various documents have been created during these three investigations, including "inspection reports prepared by the Radiation Protection program, photographs, internal pre-enforcement documents such as emails, drafts enforcement documents, and staff reviews of ProTechnics' radioactive materials license registration." (R.R. at 1953a.) "These records do not contain purely factual information." (*Id.*)

Regarding the content of these records, Director Allard attests that "[t]hese records exist and were solely created because of DEP's investigations into ProTechnics activities . . . as required under the [RPA] and its regulations." *Id.* "Releasing these records would reveal the institution and progress of DEP noncriminal investigations into its investigation of ProTechnics. . . ." *Id.*[23]

Director Allard's attestations demonstrate that the DEP's investigative records were the result of three noncriminal investigations. Each investigation consisted of a systematic and searching inquiry, which was carried out pursuant to the DEP's official duties under the RPA and involving its legislatively granted

---

[23] While some investigative records were provided to Requester, these records "memorialize the imposition of a fine or civil penalty; the suspension, modification, or revocation of a license, permit, registration, certification or similar authorization issued by DEP; or is an executed settlement agreement, redactions were required." (R.R. at 1953a.)

fact-finding powers. Clearly, the DEP has sufficiently demonstrated that certain records are exempt under the noncriminal investigation exception of the RTKL.[24]

Accordingly, the final determination of the OOR is affirmed but we reverse its finding that documents relating to the investigation of well sites made under the RPA need not be released.[25]

_____
DAN PELLEGRINI, Senior Judge

---

[24] Requester does not challenge the OOR's determination that the DEP was permitted to redact certain responsive records under Section 708(b)(6)(i)(A) of the RTKL, which exempts from disclosure "[a] record containing all or part of a person's Social Security number, driver's license number, personal financial information, home cellular or personal telephone numbers, personal e-mail addresses, employee number or other confidential personal identification number." 65 P.S. § 67.708(b)(6)(i)(A). (*See* Requester's Brief at 42). Instead, and quite incomprehensibly, Requester contends that the OOR should not have other redactions under this exemption, but then also acknowledges that the DEP is not "alleging that it did not withhold this information as personal identification information. . . ." (Requester's Brief at 41 n. 17.). Because we have affirmed the OOR's determination, we do not need to decide whether these records could have also been exempt from disclosure under Section 708(b)(6)(i)(A).

[25] Notwithstanding the DEP partially granting the RTKL request and not appealing the OOR's final determination, the DEP asks for permission not to disclose any records found protected and/or exempted under the RTKL. To the extent that the DEP or the OOR granted the request with redactions, the DEP must do so. As for those documents not specifically subject to redaction, the DEP must redact those documents constituting "public records" under the RTKL. *See* Section 706 of the RTKL, 65 P.S. § 67.706. As pertinent, a Commonwealth agency bears the burden of proving that a record is exempt from disclosure under the RTKL. Section 708(a) of the RTKL, 65 P.S. § 67.708(a). If a record is exempt or protected from disclosure, it is not a public record subject to disclosure under the RTKL. *See* Section 102 of the RTKL, 67 P.S. § 67.102; *see also Department of Labor & Industry v. Simpson*, 151 A.3d 678 (Pa. Cmwlth. 2016) (*en banc*). Conversely, if a record is not exempt or protected from disclosure "but contains information that is not subject to access, the agency may discharge its duty by providing redacted records." *Id.* at 682 (citing Section 706 of the RTKL, 65 P.S. § 67.706).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kendra Smith on behalf of     :
Smith Butz, LLC,          :
         Petitioner    :
                       :
        v.          : No. 1431 C.D. 2016
                       :
Pennsylvania Department of   :
Environmental Protection,    :
         Respondent   :

# **O R D E R**

AND NOW, this 8th day of <u>May</u>, 2017, the final determination of the Office of Open Records (OOR) dated July 27, 2016, is affirmed in part and reversed in part.

_____
DAN PELLEGRINI, Senior Judge